George FORD, Plaintiff–Appellant,

v.

BERNARD FINESON DEVELOPMENT
CENTER, Defendant–Appellee.

No. 397, Docket 95–7241.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1995.

Decided April 10, 1996.

Ned W. Branthover, Morgan & Finnegan, New York City (Scott B. Howard, New York City, on the brief), for Plaintiff–Appellant.

Valerie Singleton, Assistant Attorney General of the State of New York, New York City (Dennis C. Vacco, Attorney General, and Ronald Turbin, Assistant Attorney General, New York City, on the brief), for Defendant–Appellee.

Before: WINTER, JACOBS and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

"Title VII[ ] is a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *EEOC v Commercial Office Prods. Co.,* 486 U.S. 107, 124, 108 S.Ct. 1666, 1676, 100 L.Ed.2d 96 (1988). Layperson George Ford initiated the process under Title VII and the ADEA, alleging illegal discrimination by his employer. Under the rules governing his case, Ford had 300 days in which to file a charge with the EEOC. Ford filed his charge on day 281 with New York State's antidiscrimination agency, which is authorized to act as the EEOC's agent, and asked the agency to forward the charge to the EEOC. The EEOC received it the same day.

Unfortunately, the 300–day rule is qualified in ways that bedevil lawyers as well as laypersons. In this case, for instance, the timeliness of Ford's EEOC filing is a question that implicates statutory provisions, federal administrative rules, subtle interpretive precedents, and a state-federal inter-agency "Worksharing Agreement" that allocates initial claim-handling responsibility. The district court held that Ford filed his charge too late and therefore dismissed his claims as time-barred. We reverse in part and remand.

I

George Ford was fired on July 3, 1990 by the Bernard Fineson Development Center ("the Center"), a state mental health center, for an alleged act of sexual harassment.[1] He claims that he was fired because he is African–American, is a man, and was over 40 years of age (or because of any one of these characteristics). On April 9, 1991—281 days after his termination—he filed a formal discrimination charge against the Center with New York State's antidiscrimination agency, the Division of Human Rights ("the DHR"). The same day, the DHR "transmitted" the charge to the federal antidiscrimination agency (the EEOC), using an inter-agency form. The form has check-off boxes for the transmitting agency to indicate whether it intends to process the charge or whether it wants the receiving agency to process the charge. No box was checked. The key question in this case is what effect to give Ford's April 9 filing with the DHR. We examine this filing document in further detail below.

After the April 9 filing and transmittal, the DHR launched a four-month investigation into Ford's claims, and the EEOC apparently took no immediate action. On August 21, 1991, the DHR issued a determination that there was "no probable cause to believe" Ford's claims of race, sex, and age discrimination. The DHR notified Ford that "you have the right to request EEOC review of this action. To secure a review, you must request it in writing within 15 days of your receipt of this letter." Nine days later (August 30), Ford wrote to the EEOC, asking it to review the DHR's denial of his claims.

1. Although the date of Ford's termination was sharply contested in the district court, Ford concedes on appeal that July 3, 1990 is the proper date.

Four months later, the EEOC denied his claims and issued a right-to-sue letter.

On January 17, 1992, Ford filed his complaint in the United States District Court for the Eastern District of New York (Glasser, J.), alleging that the Center had violated Title VII of the Civil Rights Act of 1964, 42 USC §§ 2000e to 2000e–17, and the Age Discrimination in Employment Act (ADEA), 29 USC §§ 621–634.[2] For reasons not apparent from the record, it took the Center almost two years to answer the complaint. The Center then moved for summary judgment, arguing that Ford's claims were time-barred because his ·charge had not been timely filed with the EEOC, and that Ford did not present a prima facie case of discrimination under either Title VII or the ADEA. The district court heard the motion on January 27, 1995, and stayed Ford's request for discovery pending a ruling on the timeliness issue. On February 8, 1995, the district court held that (i) Ford's August 30 letter constituted his filing with the EEOC, and (ii) his claims were therefore time-barred by the 300–day limitations period, because the letter was filed 424 days after the alleged discrimination. *Ford v. Bernard Fineson Dev. Ctr.,* 1995 WL 62681, *4 (E.D.N.Y.). On appeal, Ford claims that both conclusions are in error.

## II

Ford argues that a proper and integral reading of Title VII, the ADEA, the applicable EEOC regulations, and the "Worksharing Agreement" between the EEOC and the DHR, supports the conclusion that his April 9, 1991 charge was a timely filing with the EEOC. Before we engage the merits of this argument, two preliminary matters must be resolved.

**2.** Ford also checked off a box on his form complaint alleging "retaliation," although he made no retaliation claim in his April 9 charge. He never supported this claim in the district court, and appears to have abandoned it entirely on appeal. We discuss this claim in section IV.

**3.** Worksharing Agreement Between New York State Division of Human Rights and Equal Employment Opportunity Commission for Fiscal Year 1995 ("1995 Worksharing Agreement").

A. Title VII and the ADEA authorize the EEOC to enter into cooperation agreements with state and local antidiscrimination agencies. See 42 USC § 2000e–8(b); 29 USC § 625(b); *EEOC v Commercial Office Prods. Co.,* 486 U.S. 107, 112, 108 S.Ct. 1666, 1669, 100 L.Ed.2d 96 (1988) (EEOC has entered into worksharing agreements with approximately 81 of the 109 state or local antidiscrimination agencies). Although Ford filed his charge with the DHR on April 9, 1991, Ford has only furnished to us a copy of the 1995 version of the Worksharing Agreement between the EEOC and the DHR,[3] explaining that the EEOC discards lapsed Worksharing Agreements after three years. The Center does not assert that the 1995 Agreement differs significantly from the 1991 Worksharing Agreement, arguing instead that Ford incorrectly interprets the 1995 Agreement. There is no indication that the 1991 Agreement, quoted in part in a recent published opinion of the District Court for the Southern District of New York, is materially different from the 1995 Agreement. See *Humphrey v. Council of Jewish Federations,* 901 F.Supp. 703, 708 (S.D.N.Y.1995) (quoting the "Worksharing Agreement in effect at the time of the filing of [the plaintiff's] charges," on June 28 and September 27, 1991); see also note 10 below. The 1992 Worksharing Agreement, quoted in much greater length by the Northern District of New York in *Shumway v. Hendricks,* 1994 WL 672656, *2–3 (N.D.N.Y.), is also plainly consistent with the 1995 Agreement. Because Ford has given us only the 1995 Agreement and because the Center does not dispute the applicability of its terms to this case, we adopt the parties' implicit assumption that the text of the 1991 Agreement is not materially different from the 1995 Agreement provided to us.[4]

**4.** The Center (part of a New York state agency) or its counsel (the New York State Attorney General's Office) may be able to procure a copy of the 1991 Agreement from their companion state agency, the DHR, if the DHR preserves its Worksharing Agreements. If the Center can obtain a copy after remand, the district court may prefer to review the 1991 Agreement to determine in the first instance whether the 1991 terms differ materially from the 1995 terms. If the court concludes that there is a material differ-

B. The Center urges us to bar Ford from arguing that the April 9 charge constitutes a timely filing with the EEOC, because he did not make this argument to the district court. Although "[i]t is the general rule ... that a federal appellate court does not consider *an issue* not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (emphasis added), "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Id at 121, 96 S.Ct. at 2877. Unlike the appellant in *Singleton*, who raised an entirely new *issue* on appeal, Ford is proffering a new legal argument that concerns an issue already considered at some length by the district court. We recently held that "[i]n this Circuit, we reserve considerable discretion to review purely legal questions not formally raised in the district court.... [A]rguments made on appeal need not be identical to those made below if they involve only questions of law and additional findings of fact are not required." *In re McLean Indus., Inc.*, 30 F.3d 385, 387 (2d Cir.1994) (per curiam) (internal quotations omitted), cert. denied, — U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). Ford's argument relies exclusively on legal authorities, and on an inter-agency compact the authenticity of which is not contested by the parties and which operates pursuant to and in the manner of a governmental regulation.[5] Under these circumstances (including the fact that it would be much easier for the Center or its counsel, the Attorney General's office, to obtain a copy of the Agreement than for Ford to do so), we exercise our discretion to consider Ford's argument that his April 9 charge was a timely filing with the EEOC.

## III

Discrimination claims under Title VII and the ADEA must ordinarily be "filed" with the EEOC within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 USC § 2000e–5(e)(1); see 29 USC § 626(d)(1). However, if the alleged discrimination took place in a state or locality that has its own antidiscrimination laws and an agency to enforce those laws, then the time period for "fil[ing]" claims with the EEOC is extended to 300 days.[6] 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. §§ 626(d)(2), 633(b). In this case, the discrimination alleged by Ford took place in New York, which has both antidiscrimination laws and an antidiscrimination agency. The 300–day limit therefore applies. Thus, if the charge Ford sent to the DHR on April 9 also constitutes a simultaneous "filing" with the EEOC, his claims were timely. If the April 9 charge does not constitute such a "filing," Ford's claims were properly dismissed.

ence, the analysis employed in this opinion should allow resolution of the timeliness issue without the unnecessary delay that would be occasioned by another appeal on this same issue.

5. Worksharing Agreements are much more like government regulations than any sort of contract, since they are agreements between governmental agencies, are authorized by specific statutory provisions, and have been adopted by federal regulations as an integral part of the regulatory scheme. In a sense, they are localized subsets of federal regulations.

In addition, these two-party "agreements" are principally intended to benefit third parties: the claimants who appear before the agencies. See, for example, 1995 Worksharing Agreement ¶ I(B) ("[The DHR] and the EEOC hereby agree to the terms of this Worksharing Agreement, which is designed to provide individuals with an efficient procedure for obtaining redress for their grievances."). As seven circuits have concluded (see cases cited in section III) and as we conclude today, the waiver provisions of these inter-agency compacts may determine whether a Title VII claimant is entitled to relief. They therefore have the same impact on claimants as a statute or regulation.

6. Title VII contains an additional requirement, not found in the ADEA, that must be met before the 180–day period is extended to 300 days: the person bringing the charge must "initially institute[] proceedings" with the state agency. 42 U.S.C. § 2000e–5(e)(1). Ford met that requirement, by filing first with the DHR on April 9.

Under both statutes, the 300–day period may be shortened in some cases: an individual must file the charge with the EEOC within 30 days of receiving notice from the state agency that its proceedings have "terminated." 42 U.S.C. § 2000e–5(e)(1); see 29 U.S.C. § 626(d)(2). That condition is not relevant here.

The charge that Ford filed with the DHR suggests a simultaneous filing with the EEOC. The text, under the rubric, "Title VII/ADEA EEOC CHARGE NO:____", "charge[s] the above-named respondent(s) with violating Title VII ... and hereby authorize[s] [the DHR] to accept this verified complaint on behalf of EEOC subject to the statutory limitation contained in Title VII ... [and] to accept this verified complaint as a filing under the [ADEA]." The Worksharing Agreement between the two agencies authorized the DHR to accept Ford's charge on behalf of the EEOC: "each [agency] designate[s] the other as its agent for the purpose of receiving and drafting charges." 1995 Worksharing Agreement ¶ II(A). If the DHR receives "charges alleging a violation of Title VII [or the] ADEA," it must "refer them to the EEOC." Id ¶ II(B). "[D]ual filed charges" are to be forwarded by the DHR to the EEOC "within two working days," to the extent possible, using "EEOC Form 212–A." Id ¶ II(E). The DHR used this form to forward the charge to the EEOC on April 9, and the EEOC received it. Neither the DHR nor the EEOC could have missed the fact that the April 9 charge included federal antidiscrimination claims, brought under Title VII and the ADEA, and that Ford wanted the EEOC to hear his claims. But despite these indications, further analysis is required under the ADEA and Title VII to confirm that the April 9 charge was also filed with the EEOC on April 9.

■ For Ford's ADEA claim, it is easy to conclude that his April 9 charge constituted a simultaneous "filing" with the EEOC. Under the EEOC's ADEA regulations, a charge is deemed "filed" with the EEOC when "its designated agent" "recei[ves]" the charge. 29 CFR § 1626.7(c)(1)(iii). In addition, if the EEOC "enter[s] into agreements with state or local agencies which authorize such agencies to receive charges" for the EEOC, then "[c]harges received by one agency under the agreement shall be deemed received by the other agency." Id § 1626.10(b),(c). Thus, the DHR's receipt of Ford's charge on April 9, 1991 was the equivalent of Ford's filing the charge with the EEOC on that date. His ADEA claim was therefore timely. See *Brodsky v. City Univ. of New York*, 56 F.3d 8, 9 (2d Cir.1995) (ADEA permits simultaneous filing with EEOC and state agency).

Under Title VII, however, the situation is more complicated. The statute provides that, in a state having its own antidiscrimination agency, a Title VII claim *cannot* be "filed" with the EEOC for 60 days from the date that proceedings are begun with the state agency, "unless such proceedings have been earlier terminated." 42 U.S.C. § 2000e–5(c).[7] Under this 60–day deferral provision, *receipt* of a discrimination charge by the EEOC (or the state agency) is not the same thing as a "filing" with the EEOC. When the EEOC receives a charge that is subject to the deferral provision, it holds the charge "in 'suspended animation,'" *Love v. Pullman Co.*, 404 U.S. 522, 526, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972), until either (i) 60 days have expired or (ii) the agency proceedings are "terminated." 42 U.S.C. § 2000e–5(c); *Commercial Office Prods.*, 486 U.S. at 111–12, 108 S.Ct. at 1669–70. In this case, Ford cannot rely on the first event, since 60 days after April 9 would put him well beyond the 300–day limit for "filing" claims with the EEOC. He therefore must argue, as he does, that the DHR "terminated" its proceedings some time prior to April 28 (the day the 300–day limit expired).

We know, however, that the DHR did not *complete* its investigation until August 21, well after the 300–day deadline had passed.[8]

---

7. No such provision appears in the ADEA. See *Brodsky*, 56 F.3d at 9. This 60–day deferral provision means that the cautious complainant must file a claim with the state agency within 240 days of the alleged discrimination to ensure timely filing with the EEOC. Laypersons who follow this advice should find the Title VII process a relatively simple one,. as the Supreme Court suggested in *Commercial Office Products*. 486 U.S. at 111, 124, 108 S.Ct. at 1669, 1676.

8. From April 11 to July 24, the DHR's investigation consisted of mailing Ford's charge to the Center, and corresponding with Ford and the Center to arrange a mutually convenient date for the DHR's "fact-finding conference." The conference was held on August 7. The DHR's determination was issued on August 21.

If "terminated" means "completed," Ford's argument fails.

In *Commercial Office Products,* the Supreme Court held that the term "terminated," as used in § 2000e–5(c), does not necessarily mean "completed." 486 U.S. at 114–15, 108 S.Ct. at 1670. In that case, a charge was filed with the EEOC on day 290. The EEOC transmitted the charge to the state antidiscrimination agency, with a cover form stating that the EEOC would do the initial processing of the charge. The state agency wrote back that it "waived its right under Title VII to initially [and exclusively] process the charge" during the initial 60–day period. The Court held that this waiver constituted a "termination" of the state agency's proceedings, even though the agency "still retained jurisdiction to act on the charge after the conclusion of the EEOC's proceedings." Id at 113, 108 S.Ct. at 1670. Deferring to the EEOC's interpretation of the statute, the Court concluded that "a state agency 'terminates' its proceedings when it declares that it will not proceed, if it does so at all, for a specified interval of time." Id at 115, 108 S.Ct. at 1671; see id at 126, 108 S.Ct. at 1677 (O'Connor concurring) ("I believe the result in this case is correct solely due to the traditional deference accorded the EEOC in interpretation of this statute.").

■ The EEOC's interpretation of Title VII and its terms is afforded great deference. See id at 115, 108 S.Ct. at 1671; *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 761, 99 S.Ct. 2066, 2074, 60 L.Ed.2d 609 (1979); *Tolliver v. Xerox Corp.,* 918 F.2d 1052, 1057 (2d Cir.1990). See also *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). The EEOC regulations provide that a state antidiscrimination agency *"may waive its right* to the period of exclusive processing of charges provided under section 706(c) of title VII [42 USC § 2000e–5(c) ] *with respect to any charge or category of charges."* 29 CFR § 1601.13(a)(3)(iii) (emphasis added). If—as in this case—the charging party initially "present[s]" a document to the state agency and

requests that the charge be presented to the [EEOC], the charge will be deemed to be filed with the EEOC

[a] upon expiration of 60 ... days after a written and signed statement of facts upon which the charge is based was sent to the [state] agency ..., or

[b] upon the termination of [the state] agency proceedings, or

[c] upon waiver of the [state] agency's right to exclusively process the charge,

whichever is earliest. Such filing is timely if effected within 300 days from the date of the alleged violation.

Id § 1601.13(b)(1). Thus, although Title VII expressly provides only two triggers for the commencement of EEOC proceedings (expiration of the 60–day period, and "termination" of state agency proceedings), the EEOC regulations add a third: waiver by the state agency of its "right to exclusively process the charge." According to the EEOC, then, when a state agency waives this right, with regard to either a specific charge or an entire "category of charges," the state agency's proceedings as to that charge or category of charges are deemed automatically "terminated." Such charges are therefore filed with the EEOC whenever the waiver occurs.

■ Ford argues that the "Worksharing Agreement" between the EEOC and the DHR contains a waiver of the DHR's right to exclusively process an entire category of charges that encompasses his own; that this waiver constituted an immediate "termination" of the DHR's proceedings on April 9, 1991; and that his charge was therefore timely filed under Title VII. The Center responds that this waiver cannot constitute "termination" of the DHR's proceedings because (i) the DHR began its proceedings soon after receiving Ford's charge and continued its handling of the case for four months, and (ii) the EEOC did not actually begin handling the claim until the DHR was done with it, by which point the 300–day limit had expired.

The 1995 Worksharing Agreement provides that:

For charges originally received by the EEOC and/or to be initially processed by the EEOC, the [DHR] waives its rights of exclusive jurisdiction to initially process such charges for a period of 60 days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

In addition, the EEOC will initially process the following charges:

—All Title VII charges received by the [DHR] 240 days or more after the date of violation.

1995 Worksharing Agreement ¶ III(A)(1). Ford's charge included a Title VII claim and was received by the DHR more than 240 days after the date of the Center's alleged discrimination. The EEOC was therefore required to "initially process" the charge under the terms of the Agreement.[9] And as to charges "to be initially processed by the EEOC," like this one, the DHR "waives its rights of exclusive jurisdiction ... for the purpose of allowing the EEOC to proceed immediately with the processing of such charges." Thus, the DHR's signing of the Agreement effected a waiver of its otherwise exclusive statutory right to handle Ford's case for the first 60 days after it was filed. This waiver allowed the EEOC to proceed "immediately" with Ford's case when it received the charge on April 9.

The unqualified language of the 1995 Agreement makes this waiver self-executing:

whether the DHR deferred to the EEOC or, notwithstanding the waiver, undertook its own immediate investigation (as it did here), the DHR's waiver of its right to exclusive jurisdiction went into effect as soon as Ford filed his Title VII charge on the 281st day.[10] Under *Commercial Office Products*, this waiver *may* constitute "termination" of the DHR's proceedings, even if the DHR retained concurrent jurisdiction over the charge. 486 U.S. at 115, 108 S.Ct. at 1671. And under the EEOC's regulations, the waiver *does* constitute "termination" of the DHR's proceedings, because all the elements of a timely filing with the EEOC, as defined by 29 CFR § 1601.13(b)(1), are met: (i) "a charge [was] initially presented to a [state antidiscrimination] agency"; (ii) "the charging party request[ed] that the charge be presented to the [EEOC]"; and (iii) there was a "waiver of the [state] agency's right to exclusively process the charge." Since the DHR's waiver was effective when Ford filed his charge with the DHR on April 9, the DHR's proceedings "were instantaneously terminated" on that day, *Griffin v. City of Dallas*, 26 F.3d 610, 613 (5th Cir.1994), as the term "terminated" has been interpreted by the Supreme Court in *Commercial Office Products* and by the EEOC in its regulations. Ford's charge was therefore simultaneously "filed" with the EEOC on April 9. This filing, on day 281, was timely.[11]

9. Even though ¶ III(A)(1) clearly states that the EEOC will "initially process ... [a]ll Title VII charges" filed after day 240, this provision creates a potential conflict with another provision of the 1995 Worksharing Agreement: under ¶ III(A)(2), *the DHR* "will initially process ... [a]ll charges which allege more than one basis of discrimination where at least one basis is not covered by the laws administered by EEOC but is covered by the [DHR] Ordinance." For example, if a charge filed after day 240 includes claims alleging discrimination on the basis of race (which is unlawful under New York law and Title VII) as well as marital status (which is unlawful under New York law but not Title VII), then both the EEOC (under ¶ III(A)(1)) and the DHR (under ¶ III(A)(2)) could claim the right to "initially process the charge." And, as this case demonstrates, determining which agency is to "initially process" the charge may also determine whether the charge is timely filed with EEOC. This potential conflict is not present here, however, because every basis of discrimina-

tion alleged by Ford (race, sex, and age) is covered under either Title VII or the ADEA.

10. The 1991 Agreement, as quoted in *Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 708 (S.D.N.Y.1995), contains a similar waiver: under the Agreement, the DHR "waived its 60 day exclusive jurisdiction 'over all Title VII charges including dual filed charges received between 240 and 300 days after the date of alleged discrimination.'" Id at 708 (quoting 1991 Worksharing Agreement § III(f)(6)). The Agreement defined a "dual filed charge" as a "'charge[] filed with the [DHR] and forwarded for filing with EEOC.'" Id at 708 n. 2 (quoting 1991 Worksharing Agreement § II(d)).

11. During its investigatory process, even the DHR admitted that Ford's charge was timely filed with the EEOC. The DHR's "Investigation Report" asks the investigator to answer whether the claimant "Meets Statutory Time Limit for Filing: (i) with [State] DHR? (ii) with Federal

We hold that a Worksharing Agreement may contain a self-executing waiver of a state agency's right to exclusively handle discrimination claims for 60 days, and that this waiver may constitute "termination" of state agency proceedings under § 2000e–5(c). This holding is consistent with the rulings of the seven other circuits that have considered this issue, and with the reasoning of the district courts in our Circuit that have unanimously reached the same conclusion. See *Griffin v. City of Dallas*, 26 F.3d 610, 613 (5th Cir.1994); *Worthington v. Union Pacific R.R.*, 948 F.2d 477, 482 (8th Cir.1991); *Marlowe v. Bottarelli*, 938 F.2d 807, 814 (7th Cir.1991); *Trevino–Barton v. Pittsburgh Nat'l Bank*, 919 F.2d 874, 880 (3d Cir.1990); *EEOC v. Techalloy Maryland, Inc.*, 894 F.2d 676, 678 (4th Cir.1990); *Griffin v. Air Prods. and Chemicals, Inc.*, 883 F.2d 940, 943 (11th Cir.1989); *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1479 (9th Cir.1989); *Mayo v. Securities Industry Ass'n*, 1995 WL 608291, *3 (S.D.N.Y.) (Haight, J.); *Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 708 (S.D.N.Y. 1995) (Batts, J.); *Shumway v. Hendricks*, 1994 WL 672656, *1 (N.D.N.Y.) (Scullin, J.); *Dendy v. Waldorf–Astoria Corp.*, 1993 WL 328833, *2 (S.D.N.Y.) (Preska, J.).

The Center invites us to distinguish these cases or deem them unpersuasive because (the Center claims) the fact pattern presented here is unique: a claimant files with the state agency, the agency *actually investigates* the claim (without deferring to the EEOC), and the EEOC *does not investigate* the claim until the state agency's investigation is completed. In these circumstances, says the Center, it is odd to conclude that the DHR "terminated" proceedings on April 9, 1991, when it is uncontested that the DHR began its investigation on that day and did not complete it for four months.

Although we agree that it is counterintuitive to decide that a state agency may "terminate" its proceedings before it has a chance to begin them, that anomaly is inherent in the EEOC's interpretation of the statutory term "terminated." As the Supreme Court conceded in *Commercial Office Prod-*

*ucts*, "in common usage," the "more natural[ ] or more frequent[ ]" meaning of the term "terminated" is "completed" or "ended." 486 U.S. at 115, 108 S.Ct. at 1671. But the Court rejected the "natural" reading of the term for the "liberal" one adopted by the EEOC "in order to serve the purposes of § 706(c) of Title VII [42 USC § 2000e– 5(c) ]." See *Trevino–Barton*, 919 F.2d at 880. In this case, a "liberal" construction of the term "terminated" also serves the twin purposes underlying the 60–day deferral provision. One is to let states "forestall federal intervention" for 60 days while they handle discrimination claims on their own. *Commercial Office Prods.*, 486 U.S. at 118, 108 S.Ct. at 1672. As Congress recognized, "termination" of the state agency's proceedings prior to the expiration of the 60–day period would automatically signal the agency's approval of federal entry into the case. A blanket *waiver* of the state agency's 60–day priority rights gives a similar signal, and is thus consistent with the goal of allowing states a limited priority if they want to exercise it. The other rationale for the deferral provision is to promote the efficient processing of claims. *Id* at 118–19, 108 S.Ct. at 1672–73. If, under a Worksharing Agreement, the state agency agrees in advance that the most efficient way to process a certain category of claims is to have the EEOC process them first, then this rationale for the 60–day deferral provision simply does not apply.

Concluding that the DHR "terminated" its proceedings on April 9 is also consistent with the law of other circuits. The Center is wrong to argue that the DHR's processing of Ford's claim renders the cases cited above inapposite. Several involved situations in which state agencies began processing a charge just after it was filed and continued their proceedings beyond the 300–day limit, despite a Worksharing Agreement waiver stating that the EEOC would initially process the charge. The courts that have faced this situation have held (as we do now) that the "termination" of the agency's proceedings occurred as soon as the state agency received the charge, because the Workshar-

Agency?" To both questions, the investigator filled in the word "yes."

ing Agreement waiver was self-executing. See, for example, *Marlowe v. Bottarelli,* 938 F.2d 807, 809 (7th Cir.1991); *Griffin v. Air Prods. and Chemicals, Inc.,* 883 F.2d 940, 944 (11th Cir.1989); *Humphrey v. Council of Jewish Federations,* 901 F.Supp. 703, 708 (S.D.N.Y.1995).

Finally, our construction of the term "terminated" is consistent with the need for predictability in a statutory scheme intended to be user-friendly. We remain mindful of the Supreme Court's statement that "laypersons ... are expected to initiate the [Title VII] process." *Commercial Office Prods.,* 486 U.S. at 124, 108 S.Ct. at 1676. When state agencies unambiguously waive their statutory right to exclusively process certain discrimination claims, they (and the EEOC) have made an arrangement for the benefit of claimants (as well, presumably, for administrative convenience); the timeliness of a claimant's filing therefore should not be made to depend upon whether one or the other agency follows through on its undertakings under a Worksharing Agreement. It is already difficult enough to understand the deadlines for filing Title VII claims. Claimants who master the intricacies of these deadlines have the right to expect that they will not be penalized by a bureaucrat's noncompliance with the Worksharing Agreement. See *DeMatteis v. Eastman Kodak Co.,* 520 F.2d 409, 411 (2d Cir.1975) ("It would be inequitable ... and would frustrate the remedial purpose of [Title VII of] the Civil Rights Act ... to bar the claim of a party who filed suit within the period recommended by the administrative body [the EEOC] which had been established to help vindicate [the claimant's] statutory rights."). See also *Jackson v. Richards Medical Co.,* 961 F.2d 575, 587 n. 11 (6th Cir.1992) (claimant entitled to rely on EEOC's erroneous assertion and should not be "penalized for the Commission's mistakes"); *White v. Dallas Indep. School Dist.,* 581 F.2d 556, 562 (5th Cir.1978) (in banc) ("[T]he EEOC's fail-

ure to follow its own regulations ... should not redound to [the claimant's] detriment."); *Shumway,* 1994 WL 672656, at *3 ("[A]n administrative agency error should not work to a claimant's detriment.").[12]

In short, we agree with every circuit that has considered this issue that the waiver provision of the Worksharing Agreement effects the "termination" of a state agency's proceedings "instantaneously." Agency actions that take place after the claim is filed do not affect the "termination," because the waiver is self-executing.

## IV

Ford's timely charge must be considered on its merits. The Center's summary judgment motion was based on three arguments: (i) Ford's charge was untimely; (ii) his "retaliation" claim (not par: of his DHR/EEOC charge, see note 2 above) was unsupported; and (iii) he failed to make out a prima facie case of discrimination under Title VII. *Ford,* 1995 WL 62681, at *2. Having accepted the Center's first argument, the district court did not need to reach the two remaining ones, as it acknowledged. Id at *4. Nevertheless, the district court "note[d] in passing" that it agreed with the Center's other two arguments as well. Id. On Ford's retaliation claim, the court noted Ford's concession "at oral argument that he has not supported this claim any further since having raised it by checking a box on the form complaint that was filed [in the district court]. Thus, it will be rejected." Id. Ford has not contested this ruling on appeal, and our review of the record convinces us that the district court was correct to hold that Ford has effectively abandoned his retaliation claim. We therefore affirm the district court's grant of summary judgment for the plaintiff on this count.

On Ford's discrimination claim, the court noted that "the pleadings and affidavits clearly indicate that plaintiff would fail under the requirements of *Texas Dep't of Commu-*

---

12. Our construction of the term "terminated" only limits a state agency's independence to the extent that the Worksharing Agreement does so. Our construction certainly does not bar a state agency from considering a charge after the EEOC has completed its investigation. Nor does it foreclose the agency from considering the charge simultaneously with the EEOC, although this might undermine one of the purposes of the statutory deferral provision and Worksharing Agreements: to process claims as efficiently as possible.

*nity Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and its progeny." Id. While this may well be so, we do not reach the issue because there is a remaining issue of discovery. Ford asked the court to defer its ruling on the merits of his discrimination claim until he had the opportunity to pursue additional discovery, see Transcript of Hearing on Motion for Summary Judgment, Jan. 27, 1995 at 8 ("If I could have the opportunity to take a couple of depositions in the case, we can present that evidence to Your Honor, and you can see we have a prima facie case on that point."), and the court ruled that "discovery ought to be stayed" until the timeliness issue was decided. Id at 14. We therefore remand to the district court so that it may rule on Ford's discovery request before ruling on the merits of Ford's discrimination claim.

The judgment of the district court is therefore reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion.