06-0474-cv
Richardson v. Comm'n on Human Rights & Opportunities

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2006

(Argued: February 9, 2007          Decided: July 7, 2008)

Docket No. 06-0474-cv

------------------------------------------------------x

LEONYER M. RICHARDSON,

     Plaintiff-Appellant,

     -- v. --

COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES, OFFICE OF
POLICY AND MANAGEMENT, CYNTHIA WATTS ELDER, LEANNE
APPLETON, LINDA YELMINI, DONALD BARDOT and
ADMINISTRATIVE AND RESIDUAL EMPLOYEES UNION,

     Defendants-Appellees.

------------------------------------------------------x

B e f o r e :  WALKER, SACK, and WESLEY, Circuit Judges.

Appeal by Plaintiff-Appellant Leonyer M. Richardson from an amended judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, Judge) granting Defendants-Appellees' motions for summary judgment and dismissing Richardson's suit in its entirety.

AFFIRMED.

                        JOSEPHINE S. MILLER, Danbury,
                        CT, for Plaintiff-Appellant.

                        JOSEPH A. JORDANO, Assistant
                        Attorney General of the State
                        of Connecticut, (Richard
                        Blumenthal, Attorney General,
                        David M. Teed, Assistant
                        Attorney General, on the

brief), Hartford, CT, for Defendants-Appellees CHRO, OPM, Watts Elder, Appleton, Yelmini, and Bardot.

JAMES M. SCONZO, Jorden Burt LLP, Simsbury, CT, for Defendant-Appellee Residual Employees Union Local 4200.

JOHN M. WALKER, JR., Circuit Judge:

We are asked to decide whether Title VII of the Civil Rights Act of 1964 forbids the inclusion of an election-of-remedies provision in a collective bargaining agreement, cf. EEOC v. SunDance Rehab. Corp., 466 F.3d 490, 497 (6th Cir. 2006), or, in the alternative, whether adherence to that provision constitutes discrimination. The Equal Employment Opportunity Commission ("EEOC") says that it does. The Connecticut Commission on Human Rights and Opportunities ("CHRO"), not incidentally also a defendant in this action, assures us that the EEOC is wrong.

We conclude that the law governing contracts that purport to release or waive Title VII rights is independent of the law governing employer actions taken in retaliation for, and intended to deter, employee opposition to unlawful employment practices, including the filing of charges with the EEOC or its state analogues. In analyzing the former, we apply Alexander v. Gardner-Denver Co., 415 U.S. 36, 45 (1974), and its progeny. In analyzing the latter, we apply the anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), and cases interpreting its

-2-

scope, see, e.g., Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

While there are limits on what a union may agree to in collective bargaining, Plaintiff's union has not transgressed them by contracting to limit an employee's legal recourse under certain circumstances. The collective bargaining agreement about which Plaintiff complains simply stipulates that an aggrieved employee may either arbitrate her grievance or file a charge with the CHRO describing that grievance.

Nor did the union discriminate against Plaintiff by adhering to the election-of-remedies provision after Plaintiff chose to file a charge with the CHRO. The union's choice to adhere to its collective bargaining agreement in this case was indubitably non-discriminatory: the collective bargaining agreement does not constitute a waiver of any statutory rights under Gardner-Denver, and the defendants' withdrawal from arbitration did not constitute retaliation because the forum-selection clause was a reasonable defensive measure to avoid duplicative proceedings in the two fora Richardson's employer maintained for addressing discrimination complaints. See United States v. N.Y. City Transit Auth., 97 F.3d 672 (2d Cir. 1996).

For these reasons, and because Plaintiff's remaining Title VII claims are groundless, we affirm the judgment of the district court.

**BACKGROUND**

Plaintiff-Appellant Leonyer M. Richardson, an African-American woman, was employed by the state of Connecticut for more than fifteen years. This appeal concerns the circumstances of her termination and subsequent efforts to arbitrate its legitimacy.

In 2000, Richardson transferred from the Connecticut Office of Policy and Management ("OPM") to the CHRO, joining the CHRO as a fiscal administrative officer. Shortly thereafter, she had a series of vituperative interactions with Leanne Appleton, her immediate supervisor at the CHRO, the most notable of which was a dispute concerning the proper method of making bank deposits. Richardson complained that Appleton's demand that Richardson adhere to what Appleton claimed were proper procedures was "retaliation on Leanne Appleton's part."

After airing her grievances internally on several occasions, on July 30, 2001, Richardson filed a charge with the CHRO, which was not only Richardson's employer but also the state analogue to the EEOC. In her charge, Richardson alleged both disparate treatment and retaliation by Appleton. Between July 30 and October 16, 2001, the conflict between Richardson and Appleton escalated both in intensity and breadth: On October 3, 2001, Richardson amended her CHRO charge to further allege that a second CHRO employee, Cynthia Watts Elder, who supervised

-4-

Appleton and Richardson, had retaliated against her for complaining about Appleton. Finally, on October 16, 2001, Watts Elder terminated Richardson's employment with the CHRO.

Richardson thereupon sought the assistance of her union, Administrative and Residual Employees Union Local 4200 ("Local 4200"), in grieving her termination. In the interim, however, Richardson again amended her CHRO charge, adding an allegation that Watts Elder had only terminated her "for the purpose of [further] retaliating against [her]."

As the district court explained, "[u]pon discovering that Richardson had amended her . . . complaint against CHRO to include an allegation of race discrimination regarding her termination, Richardson's union . . . withdrew its appeal of her grievance, as complaints of unlawful discrimination filed with CHRO are not subject to arbitration under the union contract." And, indeed, Article 15, Section 10(a)(2), a provision of the collective bargaining agreement (CBA) that governs the relationship between Local 4200 and the CHRO and the one that is at the center of this dispute, stipulates that

> disputes over claimed unlawful discrimination shall be subject to the grievance procedure but shall not be arbitrable if a complaint is filed with the Commission on Human Rights and Opportunities arising from the same common nucleus of operative fact.[1]

_____

[1] Plaintiff-Appellant has submitted two copies of this collective bargaining agreement. The second copy ostensibly provides that "disputes over claimed unlawful discrimination" are

-5-

Richardson filed yet another charge with the CHRO on April 9, 2002, alleging this time that Local 4200's refusal to seek arbitration of her grievance constituted an independent act of retaliation.[2]

In a state like Connecticut that has an analogue to the EEOC, an aggrieved employee must first file with the state agency any charge she wishes to pursue in federal court. See 42 U.S.C. § 2000e-5(c). However, in many of these states, including Connecticut, any such charge is automatically cross-filed with the EEOC. Lewis v. Conn. Dep't of Corr., 355 F. Supp. 2d 607, 615 n.4 (D. Conn. 2005) (discussing Connecticut); App. 1037 (charge against Local 4200 shared by CHRO with EEOC); see, e.g., Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996) (discussing New York).

Thus, both the CHRO and the EEOC responded to Richardson's various charges. On March 15, 2002, the CHRO found that Richardson had not been "subjected to any adverse treatment on

---

arbitrable until the "CHRO has held a formal hearing on the issue." While this difference is quite possibly material, as it is not clear on the record before us whether the union withdrew its appeal of Richardson's grievance before or after the CHRO held a formal hearing on her complaint, we credit the first copy of the collective bargaining agreement, as it is the only copy bearing a date stamp or a title page, and it is the copy upon which the district court relied.

[2] She also filed a similar charge on April 9, 2002 against OPM. OPM negotiated the collective bargaining agreement with Local 4200.

-6-

the basis of [her] membership in a protected class." On September 4, 2002, the CHRO found that Local 4200 had not retaliated against Richardson. Finally, on April 1, 2003, the EEOC determined, to the contrary, that "Article 15, Section 10 of the collective bargaining agreement violate[d] Title VII."

After thus exhausting her administrative remedies, Richardson filed this suit in federal district court against the CHRO, Appleton, Watts Elder, OPM, Linda Yelmini and Donald Bardot (both of whom were at all relevant times labor specialists in OPM), and Local 4200, claiming violations of Title VII, as well as 42 U.S.C. §§ 1981 and 1983, the Connecticut Fair Employment Practices Act, and the Connecticut Constitution. In a thorough opinion dated March 31, 2005, the United States District Court for the District of Connecticut (Alfred V. Covello, Judge) granted the motions for summary judgment of defendants CHRO, Appleton, Watts Elder, OPM, Yelmini and Bardot. The district court dismissed Richardson's Title VII disparate treatment claim against the CHRO because the CHRO had "sufficiently rebutted the inference of discrimination raised by the plaintiff's prima facie case," and Richardson had not adduced evidence that the CHRO's reasons for disciplining her were merely pretextual. The district court dismissed her Title VII retaliation claim against the CHRO for similar reasons, finding that the CHRO had "a legitimate non-discriminatory reason for the alleged retaliation,

'namely insubordination, poor performance, and violence in the workplace.'"

The district court also dismissed Richardson's Title VII retaliation claim against OPM. The district court held that the collective bargaining agreement "does not violate the [Federal Arbitration Act], and it cannot give rise to an inference that OPM, by enforcing the terms of the [agreement], was motivated by a discriminatory animus."[3] The district court did not address Richardson's Title VII retaliation claim against Local 4200.

On November 23, 2005, the district court granted Richardson's motion for a corrected judgment in order to address that claim. The district court noted that "[t]he Union proceeded according to [the collective bargaining agreement] . . . and the record is void of any evidence of discrimination." It thereupon granted Local 4200's motion for summary judgment.

On appeal, Richardson argues principally that the provision of the collective bargaining agreement invoked by Local 4200 to justify its refusal to seek arbitration of her grievance violates

---

[3] Finally, the district court dismissed Richardson's various state law and constitutional claims against individual defendants Appleton, Watts Elder, Yelmini, and Bardot. Richardson does not meaningfully contest the district court's dismissal of her claims against Appleton and Watts Elder, and we therefore affirm the district court's judgment in that respect. See United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993). Moreover, Richardson's claims against Yelmini and Bardot were not adequately briefed below, and we decline to consider them here. See Gwozdzinsky v. Magten Asset Mgmt. Corp., 106 F.3d 469, 472 (2d Cir. 1997).

-8-

Title VII. She also briefly contests the district court's summary judgment in the CHRO's favor with respect to her disparate treatment and retaliation claims. It is, however, to her first, and more substantial, argument that we initially turn.

**ANALYSIS**

**I. A Brief History of the Enforcement Mechanisms of Title VII**

Title VII of the Civil Rights Act of 1964 ("Title VII" or "the Act"), 42 U.S.C. § 2000e et seq., forbids employment discrimination on the basis of "race, color, religion, sex, or national origin," see 42 U.S.C. § 2000e-2(a). The Act authorizes the EEOC "to prevent any person from engaging in any unlawful employment practice" forbidden by Title VII. See 42 U.S.C. § 2000e-5(a). It also permits an "alternative enforcement procedure," Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 361 (1977): the filing of a lawsuit in federal court by an aggrieved employee, 42 U.S.C. § 2000e-5(f)(1). See generally Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 326 (1980).

As the Supreme Court has explained, "Title VII sets forth an integrated, multistep enforcement procedure [designed] . . . to detect and remedy instances of discrimination." EEOC v. Shell Oil Co., 466 U.S. 54, 62 (1984) (internal quotation marks omitted). The EEOC strives to conciliate employers and aggrieved employees, cf. Occidental Life, 432 U.S. at 368 (describing EEOC enforcement as "informal [and] noncoercive"), and acts primarily

-9-

to vindicate the public interest, see Gen. Tel. Co., 446 U.S. at 326 (noting that in vesting the EEOC with its powers "Congress sought to implement the public interest").  While the EEOC may bring actions in federal court if it is unable to secure an acceptable conciliation agreement, see 42 U.S.C. § 2000e-5(f)(1), an aggrieved employee may also bring such a lawsuit himself, which "redresses his own injury [and] vindicates the important congressional policy against discriminatory employment practices," Gardner-Denver, 415 U.S. at 45.[4]

Thus, Title VII contemplates two distinct enforcement mechanisms, but the trigger for each is the same: the filing of a charge with the EEOC by an aggrieved employee.[5]  Indeed, in structuring Title VII, Congress counted "on employee initiative." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 174-75 (2d Cir. 2005).

Because a crafty employer might seek to dissuade aggrieved

---

[4]  See also EEOC v. Cosmair, Inc., L'Oreal Hair Care Div., 821 F.2d 1085, 1089 (5th Cir. 1987); cf. EEOC v. Waffle House, Inc., 534 U.S. 279, 296 (2002); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991).

[5]  Compare EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 444 (2d Cir. 1995) (noting that under 42 U.S.C. § 2005e-6(e) the EEOC may only investigate an employer on its motion in cases concerning "a pattern or practice of discrimination"), with Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006) (per curiam) ("Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency.").

-10-

employees from filing charges with the EEOC -- and thereby shortcircuit both enforcement mechanisms -- employees potentially aggrieved under Title VII are protected from interference in two principal (and perhaps distinct) ways.[6]  First, in the "anti-retaliation provision," Congress explicitly forbade "discrimination" against an employee (1) who "has opposed any practice made an unlawful employment practice by [Title VII]" or (2) who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]," 42 U.S.C. § 2000e-3(a).  See, e.g., Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).  Second, courts have inferred from the purpose and structure of Title VII a requirement -- what we will call the "Gardner-Denver doctrine" -- that any release or waiver of Title VII meet certain requirements, including that "a collective bargaining agreement[, as opposed to an individually bargained employment contract] not waive covered workers' rights to a judicial forum for causes of action created by Congress."  Pyett

---

[6]     Courts have also sought to protect potentially aggrieved employees in other ways.  For instance, while an employee must usually file a charge with the EEOC before filing suit in federal court, we have waived this administrative exhaustion requirement with respect to retaliation claims.  As we have explained, "[t]he more effective an employer was at using retaliatory means to scare an employee into not filing future EEO complaints, the less likely the employee would be able to hold the employer liable for that retaliation because the less likely the employee would risk filing an EEO complaint as to the retaliation."  Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003).

v. Penn. Bldg. Co., 498 F.3d 88, 91 n.3 (2d Cir. 2007); cf. Rogers v. N.Y. Univ., 220 F.3d 73, 75 (2d Cir. 2000) (per curiam). Moreover, even with respect to individually bargained agreements, courts require that any such release or waiver be knowing and voluntary, see, e.g., Bormann v. AT&T Commc'ns, Inc., 875 F.2d 399, 402-03 (2d Cir. 1989), and some circuits have outright forbidden any release or waiver of the right to file a charge with the EEOC, see, e.g., SunDance, 466 F.3d at 498 (collecting cases).

Both the anti-retaliation provision and the Gardner-Denver doctrine are meant to prevent discrimination; and contribute to doing so by ensuring "unfettered access to statutory remedial mechanisms," Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). For this reason, the Second Circuit has construed them both quite broadly.[7] Compare Bormann, 875 F.2d at 403 (applying an "apparently more stringent" standard to waiver or release), and Pyett, 498 F.3d at 93-94 (union may not waive right to sue on behalf of members), with Runyan v. Nat'l Cash Register Corp., 787 F.2d 1039, 1044 n.10 (6th Cir. 1986) (en banc) (applying "ordinary contract principles" to waiver or release), and Austin v. Owens-Brockway Glass Container, Inc., 78

---

[7] For instance, we have held that an employee is protected from retaliation even if he opposes a lawful employment practice, so long he reasonably believed that the practice was unlawful. Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

F.3d 875, 880-86 (4th Cir. 1996) (union waiver of right to sue valid).

**II.  Richardson's Collective Bargaining Agreement**

   **A. The Difference Between the <u>Gardner-Denver</u> Doctrine and the Anti-Retaliation Provision in This Case**

Richardson argues that Article 15, Section 10 of the collective bargaining agreement violates the anti-retaliation provision of Title VII.  Appellant's Br. at 5 ("[T]he contract clause at issue in this case constitute[s] a prima facie case of forbidden retaliation."); <u>id.</u> at 16 (arguing that the collective bargaining agreement reflects "a retaliatory policy").  Because Richardson has misperceived the relationship between the <u>Gardner-Denver</u> doctrine and the anti-retaliation provision, we pause to explain the ways in which they may overlap, and the substantial ways in which they do not.

While both the anti-retaliation provision and the <u>Gardner-Denver</u> doctrine assure "the EEOC's ability to investigate and select cases from a broad sample of claims," <u>see</u> <u>Waffle House</u>, 534 U.S. at 296 n.11; <u>supra</u> (discussing how ensuring access to statutory mechanisms prevents discrimination), each works in a different way.  Broadly speaking, the anti-retaliation provision protects employees from <u>particular acts of discrimination</u> that are retaliatory.  Indeed, the anti-retaliation provision forbids only "discrimination."  <u>See</u> <u>United States v. N.Y. City Transit Auth.</u> (<u>NYC Transit</u>), 97 F.3d 672, 677 (2d Cir. 1996) ("[I]t is

-13-

important to remember that what the statute actually prohibits is discrimination."). And discrimination claims require courts to consider in detail such variables as the intent of the employer[8] and how the employer's actions have affected the employee.[9] The Gardner-Denver doctrine, by contrast, protects employees from certain kinds of company policies that violate Title VII. See, e.g., Cosmair, 821 F.2d at 1089-90 (holding that waiver of right to file charge with EEOC is void as against public policy). As the following analysis demonstrates, the election-of-remedies provision in this case violates neither the Gardner-Denver doctrine nor the anti-retaliation provision of Title VII.

**B. Article 15, Section 10 of Richardson's collective-bargaining agreement does not violate the Gardner-Denver doctrine.**

The Gardner-Denver doctrine does not preclude a union and an

---

[8] See Jute, 420 F.3d at 173 (noting that employee must ultimately show retaliatory motive); cf. James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000) (noting under Title VII's substantive provisions that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff") (emphasis added) (alteration in original).

[9] See Burlington, 548 U.S. at 69 (holding that "the significance of any given act of retaliation will often depend upon the particular circumstances") (emphasis added); see, e.g., id. (noting that "[a] schedule change . . . may make little difference to many workers, but may matter enormously to a young mother with school age children"); see also Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships . . . ."); Joseph v. Leavitt, 465 F.3d 87, 95 (2d Cir. 2006) (Jacobs, J., concurring).

-14-

employer from agreeing that employees must forego their right to arbitrate a grievance if they bring a lawsuit in federal court arising out of the same facts. In Gardner-Denver, the Supreme Court said in dicta that "there can be no prospective waiver of an employee's rights under Title VII." 415 U.S. at 51.[10] While we have acknowledged the uncertain descriptive power of this dicta, see Fayer v. Town of Middlebury, 258 F.3d 117, 122 (2d Cir. 2001) (noting the tension "between the cases denying preclusive effect to collective bargaining arbitrations, on the one hand, and the cases holding individual arbitration agreements enforceable as against federal statutory and constitutional claims, on the other"), Article 15, Section 10 passes muster even under this formulation of the Gardner-Denver doctrine. Richardson remained free to file a charge with the EEOC, as she did, and to pursue a Title VII action in federal court, as she has. She did not prospectively waive any of her Title VII rights, nor did her union do so on her behalf.

In fact, Article 15, Section 10 is a rather sensible outcome of the collective bargaining process. It makes sense that an employer might not wish to "retain legal counsel to deal with discrimination claims and take other steps reasonably designed to

_____

[10] We consider this statement dicta because Gardner-Denver concerned only whether "arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims." See Gilmer, 500 U.S. at 35.

-15-

prepare for and assist in the defense" of a lawsuit while simultaneously preparing for an arbitration hearing on the same issue.  Cf. NYC Transit, 97 F.3d at 677.  And it also makes sense that a union might want to deploy its scarce resources selectively.

**C. Article 15, Section 10 of Richardson's collective-bargaining agreement does not violate the anti-retaliation provision.**

Richardson argues that whether or not the election-of-remedies provision violates Gardner-Denver, her union's decision to adhere to that provision after she filed a charge with the CHRO constituted discrimination.  As we have explained, "[t]o establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action."  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (internal quotation marks omitted).  Richardson's claim fails because she has not made a prima facie showing that either agreeing to or adhering to the election-of-remedies provision constitutes an adverse employment action by either her employer or her union.

NYC Transit discusses the "adverse employment action" element of a retaliation claim in a context very similar to the one presented here.  In that case, defendant-employer New York

-16-

City Transit Authority ("Transit Authority") established an Equal Employment Opportunity Division to "handle[] employee discrimination complaints through informal settlement and mediation proceedings." 97 F.3d at 674. As a matter of formal policy, however, that forum would refuse to consider a complaint once it became the subject of a lawsuit against the Transit Authority or a "charge filed with a city, state, or federal anti-discrimination agency;" such claims would be handled by the Transit Authority's Law Department. Id. Plaintiffs alleged that this policy constituted "an 'adverse employment action' within the meaning of Title VII," and the court opined that this was "the only question" in the case. Id. at 677.

At the outset, the court noted its reluctance to interpret the term "adverse" broadly in the context of an employer's litigation of discrimination claims, observing that, "[a]t some level of generality, any action taken by an employer for the purpose of defending against the employee's charge can be characterized as adverse to the employee." Id. It ultimately upheld the policy, holding that "[r]easonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment." Id. The court found that the Transit Authority's policy constituted such a reasonable measure because, inter alia, it "avoid[ed] parallel and duplicative

-17-

proceedings," in the Equal Employment Opportunity and the Law Department, thus allowing the employer's counsel to render effective advice through centralized administration of its litigation. Id. The court also noted that the Transit Authority's defensive measures "d[id] not affect the complainant's work, working conditions, or compensation," and that its "control over the handling of claims against it serve[d] several essential purposes that have nothing to do with retaliation, malice, or discrimination." Id.

The policy embodied by the CBA's election-of-remedies provision also avoids duplicative proceedings in the two fora maintained by the employer for adjudicating claims of discrimination without affecting a complainant's work, working conditions, or compensation. It does not foreclose other avenues of relief, such as the right to pursue claims in federal court which was at issue in Gardner-Denver, or the right to pursue claims with non-CHRO bodies such as the EEOC. Indeed, the CBA does not appear even to foreclose subsequent filing of claims with the CHRO. CBA art. 15, § 10 ("[D]isputes over claimed unlawful discrimination shall be subject to the grievance procedure but shall not be arbitrable if a complaint is filed with the [CHRO] arising from the same common nucleus of operative fact." (emphasis added)). It only requires that the employee make a concrete choice, at a specific time, between filing a

state claim with the CHRO and having the union pursue his or her grievance in arbitration.

Accordingly, the election-of-remedies provision seems to qualify as a "reasonable defensive measure" utilized by Richardson's employer to litigate discrimination claims brought against it effectively and efficiently, and plaintiff fails to persuade us otherwise. Richardson only attempts to distinguish NYC Transit on the ground that complainants here "have a contractual or other entitlement to 'internal claims-handling procedures.'" Appellant's Br. at 7. This entitlement, however, is subject to the employer's permissible, non-discriminatory defensive measures by virtue of the same contract that creates the entitlement: Richardson has no contractual right to internal arbitration if she has filed a charge with the CHRO. Because Richardson has failed to distinguish NYC Transit, she has failed to establish that her employer committed an adverse employment action, an indispensable element of a prima facie case of retaliation under Title VII.

It follows from this conclusion that the union's withdrawal from arbitration once Richardson filed her CHRO charge does not constitute an adverse employment action on the union's part. The union had no contractual obligation to continue pursuing arbitration in those circumstances; indeed, it was contractually obligated to desist. In addition, it would have been futile for

-19-

the union to continue to arbitrate because the employer was relieved of its contractual obligation to arbitrate once Richardson filed her claim, and it refused to arbitrate under such circumstances as a matter of policy. We cannot conclude that the union's refusal to persist in a futile act, where the futility is attributable entirely to an employer's reasonable defensive measures, constituted an adverse employment action. Accordingly, Richardson has failed to establish a prima facie case of retaliation as to the union.

Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991), is not to the contrary. We did decide, in that case, that a union's "refusal to proceed with the grievance process" constituted an adverse employment action, even though the employer in Johnson also had a policy of discontinuing internal grievance proceedings once an employee filed a charge with the state anti-discrimination agency. Id. at 206-7. The decision in Johnson, however, was premised on the assumption that the employer, by implementing the policy in question, also violated Title VII's retaliatory provision. Id. at 208 ("We think a plaintiff establishes retaliation by showing that the union acquiesces in a company policy that abridges the statutory rights of the plaintiff."). In light of NYC Transit, decided several years after Johnson, such an assumption is not tenable in this case where the employer–the State of Connecticut–employed a reasonable defensive

-20-

measure to avoid duplicative litigation in the two fora it maintained for addressing claims. Furthermore, we have interpreted Johnson as "hold[ing] that a union's abandonment of a grievance that the union has a contractual responsibility to pursue on the employee's behalf amounts to an adverse employment action." NYC Transit, 97 F.3d at 678. As discussed above, the union had no such obligation here.

Richardson also relies on EEOC v. Board of Governors, 957 F.2d 424 (7th Cir. 1992). In that case, an employer refused to continue with internal grievance proceedings after its employee filed a charge with the EEOC. The grievance proceedings were established by a collective bargaining agreement, which also provided that the employer "ha[d] no obligation to entertain or proceed further with . . . [a] grievance procedure" if the aggrieved employee filed a charge with any non-arbitral body, such as the EEOC. Id. at 426. In finding that the employer's action violated the ADEA, the Seventh Circuit held that "[a] collective bargaining agreement may not provide that grievances will proceed to arbitration only if the employee refrains from participating in protected activity under the ADEA." Id. at 431.

Our case law does not permit us to follow this holding on the facts of this case. In reaching its conclusion, the Board of Governors court assumes, without explanation, that an employer's decision to withdraw from arbitration constitutes an adverse

-21-

employment action, even though the language of the CBA explicitly authorizes such action.  See id. at 427-28 ("When charged with unlawful retaliation . . ., an employer may offer a legitimate non-discriminatory reason for taking an adverse action against an employee who has engaged in protected activity.").  As discussed above, NYC Transit does not permit us to make a similar assumption here.  Accordingly, Richardson's reliance on Board of Governors is misplaced.

**III. The District Court's Summary Judgment for the CHRO**

We turn now to Richardson's other argument on appeal: that the district court improperly entered summary judgment in the CHRO's favor on her disparate treatment and retaliation claims. Richardson contends that several issues of material fact remain in dispute; in particular, she says that she has produced sufficient evidence to justify a trial on the question of whether the CHRO's asserted justification for the various disciplinary measures it took, and for its ultimate decision to terminate her employment, was legitimate or but a pretext for discrimination and retaliation.  Appellant's Br. at 24.[11]  In conducting this review, we are required to consider the record in the light most

---

[11]   We assume without deciding, as did the district court, that Richardson has presented a prima facie case of disparate treatment and retaliation; we inquire only whether the plaintiff can "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

favorable to Richardson.  Kessler, 461 F.3d at 201.

On a disparate treatment claim, the "employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some . . . nondiscriminatory reason for the employer's decision."  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000); Getschmann v. James River Paper Co., 822 F. Supp. 75, 78 (D. Conn. 1993), aff'd, 7 F.3d 221 (2d Cir. 1993) (where there is overwhelming evidence that the employer had a legitimate reason to dismiss an employee, the employee must present more than few isolated pieces of contrary evidence to survive summary judgment).  Here, as the district court explained after thoroughly canvassing the record, "there is overwhelming evidence [that the CHRO terminated Richardson's employment due to her] insubordination and hostile behavior."

On her retaliation claim against Appleton and Watts Elder, as with her retaliation claim against the union and the CHRO, Richardson can survive summary judgment if she can show that an issue of fact exists as to whether "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause."  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (emphasis added).  But Richardson's broad allegations of retaliation are unsubstantiated by any corroborative evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (stating that when the plaintiff has adduced evidence sufficient

to constitute a prima facie case, and the employer has articulated a legitimate nonretaliatory reason for the adverse action, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is a pretext for impermissible retaliation).

Thus, the district court's entry of summary judgment in the CHRO's favor on both claims was proper.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.