**Dee Bonnie MARLOWE, Plaintiff–Appellant,**

**v.**

**Bruno BOTTARELLI, et al., Defendants–Appellees.**

No. 90–2858.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1991.

Decided Aug. 7, 1991.

Rehearing and Rehearing In Banc Denied Sept. 10, 1991.

Scott A. Mayer, Arnold & Kadjan, Chicago, Ill., for plaintiff-appellant.

Stephen Novack, Kenneth S. Schlesinger, Novack & Macey, Chicago, Ill., for defendants-appellees.

Gwendolyn Young Reams, Vincent Blackwood, E.E.O.C., Donald R. Livingston, Paul D. Ramshaw, Jennifer S. Goldstein (argued), E.E.O.C., Washington, D.C., for amicus curiae.

Before BAUER, Chief Judge, and COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This employment discrimination suit presents a unique question regarding the interpretation of a worksharing agreement between the Illinois Department of Human Resources (IDHR) and the Equal Opportunity Employment Commission (EEOC). Under the district court's interpretation of the agreement, plaintiff Marlowe's discrimination charge was untimely under federal law. Marlowe, the IDHR, and the EEOC take a different view; according to their reading, Marlowe's complaint was, in fact, timely. We agree with the latter view of the agreement and reverse. Further, we hold below that the workshare agreement between the two agencies is self-executing, resolving a question upon which we reserved judgment in *Sofferin v. American Airlines Inc.*, 923 F.2d 552 (7th Cir.1991).

## I.

On March 28, 1986, Dee Bonnie Marlowe was discharged by her employer, Bruno Bottarelli. Two hundred and ninety-nine days later, on January 21, 1987, she filed

employment discrimination charges with the IDHR against Bottarelli and his company, Marquette Properties, alleging that Bottarelli sexually harassed her, and that this harassment created a hostile work environment which led to her discharge. On the same day, Marlowe filed identical charges with the Equal Opportunity Employment Commission (EEOC). This dual filing, we shall see, created a good deal of confusion.

The confusion stems from the existence of a so-called "workshare agreement" between the IDHR and EEOC, which apportions initial jurisdiction over discrimination complaints between the two agencies. (We have extensively discussed the operation of the workshare agreement between the IDHR and EEOC in *Hong v. Children's Memorial Hospital,* 936 F.2d 967 (7th Cir. 1991) and *Sofferin, supra,* and will presume the reader's familiarity with these opinions). Under the agreement, *either* the IDHR *or* the EEOC should have been vested with initial jurisdiction to review Marlowe's complaint. Nevertheless, *both* agencies proceeded to process her charges. Although untimely under state law (the

state statute of limitations provides that discrimination charges must be filed within 180 days of the alleged discriminatory act, *see* ILL.ADMIN.CODE tit. 56, § 2520.310), the IDHR began processing Marlowe's complaint and did not officially terminate it on grounds of untimeliness until May 29, 1987. The language of the workshare agreement seemingly supports the IDHR's decision to assume jurisdiction over Marlowe's charges. Paragraph 7(d) states that the IDHR shall have initial jurisdiction over complaints filed on the same day with both the state and the EEOC. If the IDHR was correct in assuming jurisdiction over Marlowe's complaint pursuant to the workshare agreement, then it could not be deemed timely filed with the EEOC. Under Title VII, Marlowe could not file with the EEOC until she filed with the state and either (1) 60 days elapsed or (2) the state terminated its interest in her complaint, whichever came first.[1] *See* 42 U.S.C. § 2000e–5(c). In her case, the 60 day period lapsed first on March 21, but by that time, the 300–day federal statute of limitations had already run.[2]

1. To the reader unfamiliar with the terrain of Title VII, this may seem strange. Why must the state actually terminate its interest in a plaintiff's complaint if the state statute of limitations has already run? Should not a plaintiff be allowed to bypass the state agency and file directly with the EEOC in such a case? No. The courts have interpreted Title VII to require that a plaintiff file with the state agency even if the state statute of limitations has run. *See EEOC v. Commercial Office Prods.,* 486 U.S. 107, 122–24, 108 S.Ct. 1666, 1675–76, 100 L.Ed.2d 96 (1988); *Mohasco Corp. v. Silver,* 447 U.S. 807, 816–18, 821, 100 S.Ct. 2486, 2494–95, 65 L.Ed.2d 532 (1980); *EEOC v. Commercial Office Prods.,* 803 F.2d 581, 586 (10th Cir.1986), *rev'd on other grounds,* 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988). The reason for this requirement is twofold. First, the express language of Title VII mandates that the EEOC may not assume jurisdiction over a discrimination complaint until it has first been filed with the state agency and either sixty days have transpired or the state has terminated the complaint. This language seemingly affords no room for an interpretation that would bypass the state deferral mechanism when complaints are untimely under state law. Second, the alternative—allowing direct filing with the Commission without an intervening act of state termination—would "embroil the EEOC in complicated issues of state law." *Commercial Office Prods.,* 486 U.S.

at 124, 108 S.Ct. at 1676. In such a case, the EEOC would be compelled to decide whether the state statute of limitations has indeed run before accepting a complaint. And to do so, it would have to determine whether the limitations period was jurisdictional or nonjurisdictional, and if it was nonjurisdictional, whether it was waived or equitably tolled. "The EEOC has neither the time nor the expertise to make such determinations under the varying laws of the many deferral states ..." *Id.* It is for this reason that the EEOC has entered into workshare agreements with state agencies. Workshare agreements contain the states' express waiver and termination of their jurisdictional prerogative and therefore avoid the problems discussed above. The question before us is whether the agreement between the IDHR and EEOC provides for an appropriate end-run around Title VII's filing requirements with respect to Marlowe's complaint.

2. To ensure that they are afforded an opportunity to file with the EEOC in deferral states, plaintiffs are advised to submit their complaints to the appropriate state agency within 240 days of the alleged discriminatory act; by doing so, the statutory sixty day waiting period will necessarily lapse before the running of the 300–day federal statute of limitations and allow for timely filing with the EEOC. *See Mohasco,* 447 U.S.

While all this was happening, the EEOC was acting upon Marlowe's complaint as well. The IDHR's designated agent in the EEOC, Renadar Curtis, was responsible for reviewing complaints received by the EEOC and determining whether the state wished to process the complaint or whether it chose to waive its initial processing rights and allow the EEOC to assume jurisdiction. Curtis determined that under the workshare agreement, Marlowe's complaint fell within the initial jurisdiction of the EEOC. She believed that according to the agreement, charges that were untimely under state law were deemed waived and terminated by the state and slated for processing by the EEOC. She thus proceeded to complete the paperwork that terminated the state's interest in Marlowe's complaint and initiated the EEOC's investigation into plaintiff's charges.

Shortly after filing with the EEOC, Marlowe received a right-to-sue letter from the agency. She filed suit in district court, but the district court dismissed her suit on defendants' motion for summary judgment on the ground that her EEOC complaint was untimely. The court read paragraph 7(d) of the workshare agreement to vest jurisdiction over Marlowe's complaint with the IDHR, not the EEOC.[3] Under this reading, the IDHR did not terminate Marlowe's complaint until May 1987. And, of course, the 60–day state deferral period did not run until late March 1987. Either way, Marlowe was not authorized under Title VII to file charges with the Commission until long after the 300–day federal limitations period had expired on January 22, 1987. Her EEOC complaint, the court ruled, was therefore untimely. The fact that the IDHR agent at the EEOC read the agreement differently was of little moment, concluded the court, because that reading contravened the agreement's plain language.

Marlowe then filed a motion for reconsideration. With her motion, she submitted the declarations of Jeffrey Drager, manager of the Charge Processing Division of the IDHR, and Marietta Morgan, State and Local Coordinator for the EEOC's Chicago District Office. Both participated in the negotiations that led to the execution of the workshare agreement and were responsible for supervising the administration of the agreement in their respective agencies. The two officials averred that the parties to the agreement did not intend charges untimely under state law to be reserved to the IDHR for initial processing; rather, Morgan and Drager explained, they intended such charges to be the sole province of the EEOC. In support of their position, the declarants referenced an EEOC regulation in force at the time of the signing of the agreement. *See* 29 C.F.R. § 1601.13(a)(3) (1986). The regulation provided that complaints untimely under state law need not be filed first with the state; according to the regulation, such complaints were deemed timely filed with the EEOC upon receipt, without any other action on the part of the state to terminate its interest in the charges. Morgan and Drager both testified that the two agencies executed the workshare agreement with the EEOC regulation in mind; it was understood that the workshare agreement was to be read and applied consistently with the regulation. Drager conceded that the IDHR's continued processing of Marlowe's untimely complaint conflicted with this understanding, but contended that the state's actions were the result of a clerical error and should be given no legal effect. After examining the declarations, the district court granted Marlowe's motion for reconsideration, stating that the declarations constituted "strong evidence of [the parties'] intention[s] as to how the agreement is to operate," and that the interests of justice thus required reconsideration of

---

at 814, n. 16, 100 S.Ct. at 2491, n. 16; *Commercial Office Products,* 486 U.S. at 111, 108 S.Ct. at 1668–69. Marlowe did not follow this advice, and filed with both agencies on day 299; she is thus dependent on the workshare agreement to terminate the state's interest in her complaint so as to allow for timely filing with the EEOC.

3. The relevant paragraph of the agreement states that the IDHR will process "[c]harges filed with the IDHR and EEOC on the same day by a charging party."

its decision to grant the defendants summary judgment. *See* Memorandum Opinion, October 6, 1989, at 8.

In a subsequent memorandum opinion following defendant's second motion for summary judgment, the district court again held plaintiff's complaint untimely under federal law, for essentially the same reasons that it had set out in its first opinion. The court observed that while the intent of the parties appeared to be what Drager and Morgan said it was, the better course was to give legal effect to the plain language of the agreement. It therefore dismissed plaintiff's complaint as untimely. Marlowe now appeals. She contends—as does the Commission in an *amicus* brief—that we ought to give effect to the intent of the state and the EEOC in executing the agreement and hold that her complaint was timely filed with the EEOC because the Commission properly had jurisdiction under the workshare agreement to process charges that were untimely under Illinois' shorter limitations period. We agree with Marlowe and the Commission.

## II.

Paragraph 7(d) of the workshare agreement states that charges filed on the same day with both the IDHR and the EEOC are to be processed initially by the state. The question before us is whether, as Marlowe, the state, and the EEOC contend, the agreement should be read to effectuate the apparent intent of the contracting parties; that is, whether it should be read to include what amounts to an unwritten clause providing that the state waives initial jurisdiction over all charges untimely under state law.[4] In a nutshell, Marlowe and Bottarelli have presented us with two paradigmatic interpretive arguments, one championing the drafters' intent and the other heralding the text's "plain language."

The EEOC also presents us with a third option. It argues that rather than conclusively interpret the workshare agreement ourselves, we should simply "defer" to its interpretation of the agreement. The

courts, the Commission urges, "should show great deference to an agency's interpretation of its own internal directives." Brief at 13 (citing *EEOC v. Techalloy Maryland Inc.*, 894 F.2d 676, 678–79 (4th Cir. 1990)). While we agree with the EEOC's proposed result, and while we agree in the abstract with its proposition regarding the nature and scope of our review, we do not believe that this is a case where the correct result is dictated by our deference to an agency's interpretive gloss. A discussion of why deference is inappropriate is, however, instructive in reaching our result.

■ The thrust of our jurisprudence counseling deference to administrative agency interpretations of statutes is that where Congress' intent in enacting a particular provision of a statute is difficult to discern, we give deference to the views of the agency charged with administering the statute, so long as the agency's suggested interpretation is reasonable. *See, e.g., Chevron Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901, 906–07 (7th Cir.1990). Similarly, when the question at hand involves an administrative agency's interpretation of its own regulation, and the meaning of the regulation is in doubt, the courts will defer to the agency's interpretation if that interpretation is reasonable. *See, e.g., Martin v. OSHRC,* —— U.S. ——, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991); *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 1323–24, 28 L.Ed.2d 625 (1971); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Reilly,* 893 F.2d at 907. In both circumstances, deference to an agency's interpretation is appropriate only because the intent of the drafter or drafters—whether Congress or the agency itself—is in doubt. *See Mead Corp. v. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989); *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *National Coalition Against the Misuse of Pesticides v. Thomas,* 809 F.2d 875,

---

**4.** We note that the IDHR and the EEOC have since the initiation of this suit amended the workshare agreement so that its express terms reflects this intent.

881–82 (D.C.Cir.1987). Intent is, of course, at the heart of the judicial inquiry because the courts endeavor to give effect to the designs of Congress and the agencies to which the legislature has delegated authority. *See Griffin v. Oceanic Contractors Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) ("Our task is to give effect to the will of Congress"); *United States v. American Trucking Assns. Inc.*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) ("[T]he function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress."). In discerning intent, courts traditionally focus on the language of statutes and regulations because we presume that legislatures and agencies mean what they say; most of the time, the "plain language" of a statute or regulation will be the best indicator of the enacting body's will, *see, e.g., West Virginia University Hospitals Inc. v. Casey*, — U.S. —, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991); *American Trucking*, 310 U.S. at 543, 60 S.Ct. at 1063–64, and thus, only when the text is silent or ambiguous will we defer to an administrative agency's interpretation.

■ In the case before us, there is no need to defer in the sense that the EEOC suggests because the predicate condition to the application of deference—ambiguity as to the drafters' intent—is absent. The district court suggested, and we agree, that the two agencies intended to waive the state deferral period with respect to untimely state claims. *See* Memorandum Opinion, July 12, 1989, at 10 (to honor the plain language of the agreement "lead[s] to absurd results and fail[s] to effectuate [its] general intended purpose"); Memorandum Opinion, October 6, 1989, at 8 ("There is no doubt that the parties' understanding of the Work Sharing Agreement is strong evidence of their intention as to how the agreement is to operate."). What makes this case perplexing is that this intent is in tension with the language of the agreement ostensibly designed to codify it.

How, then, do we resolve a conflict between "plain language" and what we might call "plain intent"? The general rule is that where a text is unambiguous, its plain language controls, except "in the rare case where the application of the statute as written will produce a result 'demonstrably at odds with the intentions of the drafters.'" *Demarest v. Manspeaker*, — U.S. —, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991) (quoting *Griffin*, 458 U.S. at 571, 102 S.Ct. at 3250); *see also Consumer Products Safety Commission v. GTE Sylvania*, 447 U.S. 102, 109, 100 S.Ct. 2051, 2056–57, 64 L.Ed.2d 766 (1980); *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965). In the rare case where literal application of a text would lead to absurd results or thwart the obvious intentions of its drafters, "those intentions must be controlling." *Griffin*, 458 U.S. at 571, 102 S.Ct. at 3250; *see also Brown*, 380 U.S. at 571, 85 S.Ct. at 1166. *American Trucking*, 310 U.S. at 543, 60 S.Ct. at 1063–64 (collecting cases), *Helvering v. Hammel*, 311 U.S. 504, 510–11, 61 S.Ct. 368, 371–72, 85 L.Ed. 303 (1941). This, in our view, is the exceptional case. The obvious intent of the drafters of the workshare agreement was to effect state waiver of complaints untimely under state law and delegate initial jurisdiction over such complaints to the Commission.[5] Where the intent of an agency in promulgating a regulation or agreement is clear, and where, as here, that intent is not in tension with the agency's organic statute or regulations promulgated pursuant to that statute, we believe that the courts must give effect to the agency's purposes.

To put it differently, the workshare agreement between the IDHR and EEOC is essentially a contract apportioning jurisdiction between the two agencies. As we know, "the overriding purpose in construing a contract is to give effect to the mutual intent of the parties at the time the contract was made; [ ] while the language of the contract is normally the best evidence of that intent, a court can properly

---

**5.** There are, of course, arguments to be made that the affidavits of Drager and Morgan are not sufficiently compelling indications of the intent of the state and the EEOC in executing the workshare agreement. We treat these arguments *infra* at 813–814.

disregard even unambiguous language when it is convinced that the parties meant something different from what they said." *White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982); *see also* Restatement (Second) of Contracts, § 202, comment c, § 212 comment b (1981). We have done exactly that in interpreting consent decrees—contracts of a sort—that say one thing yet seem to mean another. *See Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1013 (7th Cir.1984) (" 'it is permissible to construe unambiguous language where the construction is necessary to determine the intended rather than the literal meaning of the decree.' ") (quoting *Roughton*, 689 F.2d at 120). We also note that the Fourth Circuit has reasoned in similar fashion from contract law in interpreting a workshare agreement. *See EEOC v. Techalloy Maryland Inc.*, 894 F.2d 676, 679 (4th Cir. 1990) ("[B]oth the EEOC and [the state agency] agree that this is the proper interpretation of the [workshare] agreement. To adopt [the employer's] position would thus contravene one of the most basic tenets of contract law, that a contract should be interpreted to effectuate the intent of the parties.").

Defendants argue that the declarations of Morgan and Drager, both of whom were involved in negotiating, and are presently involved in administering the agreement, "smack of hindsight and artificiality" and therefore ought not to be credited as evidence of the agencies' intentions at the time of the agreement's execution. This argument cannot be lightly dismissed. Defendants are correct in suggesting that, standing alone, the *post-hoc* intentions of the IDHR and the EEOC are insufficient to work an effective amendment of the agreement. *Cf. Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's *post-hoc* rationalizations for agency action"); *see also Martin*, 111 S.Ct. at 1179. Here, however, we are presented with considerably more than mere *post-hoc* arguments. We note first that the district court appears to have found the declarations of Morgan and Drager credible; it

accepted them as evidence of the parties' intentions at the time of the agreements' execution and never questioned their "hindsight" or "artificiality." *See* Memorandum Opinion, October 6, 1989, at 8 ("There is no doubt that the parties' understanding of the Work Sharing Agreement is strong evidence of their intention as to how the agreement is to operate."). We defer to this implicit credibility judgment. More importantly, Marlowe and the EEOC have also presented extrinsic evidence that lends powerful support to their view of the intent behind the workshare agreement. An EEOC regulation in effect at the time of the agreement's execution, *see* 29 C.F.R. § 1601.13(a)(3) (1986), provided that charges that were untimely under state law could be filed solely with the EEOC. A complaint untimely under state law would be deemed timely filed with the EEOC if submitted within the 300 day federal limitations period, regardless of whether the state took independent action to terminate its interest in the charge. It is fair to presume that neither the EEOC nor the state intended to enter into a workshare agreement that conflicted with the EEOC regulation; this, of course, is nothing more than a variation of the rule that whenever possible courts construe statutes and regulations in *pari materia*. *Cf.* 2A C. Sands, Sutherland Statutory Construction § 51.02 (4th ed. 1984) ("SUTHERLAND") ("It is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter. In the absence of any express repeal or amendment, the new provision is presumed in accord with the legislative policy embodied in those prior statutes."); *Fallon v. State of Illinois*, 882 F.2d 1206, 1214 (7th Cir.1989); *Davis v. Barber*, 853 F.2d 1418, 1425 (7th Cir.1988). The EEOC regulation is thus persuasive evidence of the parties' intentions at the time of the agreement's execution. Defendants retort in their brief that the EEOC regulation was unlawful, and therefore should play no role in our analysis. There is support for defendants' attack on the regulation, *see EEOC v. Commercial Office Prods.*, 803 F.2d 581, 586 (10th Cir.1986), *rev'd on oth-*

*er grounds,* 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *supra* note 1, and indeed, the regulation has since been repealed, but all this is by the by. However unlawful it may have been, the regulation was in force when the parties adopted their agreement, and is therefore probative of their intent at the time. *Cf.* SUTHERLAND, § 51.04 ("An act relating to the same subject matter need not be a valid and existing statute to be construed with an ambiguous act in order to help determine its meaning.").

■ We conclude that the workshare agreement vested initial jurisdiction over Marlowe's complaint in the Commission. The state's continued processing of Marlowe's complaint was thus erroneous.[6] This is not, however, the end of our inquiry. Although the EEOC received Marlowe's complaint on day 299, Curtis, the official in charge of administering the workshare agreement, did not complete the paperwork terminating the state's interest in Marlowe's charges until January 26, 1987, day 304. Defendants contend that even if we read the workshare agreement as a waiver of the state's interest in Marlowe's charge, that waiver was not effected in time to allow for timely filing with the EEOC.

We find this argument unpersuasive. On its face, the workshare agreement appears to be self-executing—no discretionary action on the part of the IDHR's agent in the EEOC need be taken to effectuate the waiver provisions of the agreement. The agreement directs that the IDHR's agent will review charges filed with the EEOC "to determine whether IDHR *has agreed* to terminate its activity respecting the charge ... i.e., whether the charge falls within those classes of charges affected by the Work Sharing Agreement waiver provisions." (emphasis added). Other paragraphs in the agreement (7 and 8) set out those categories of charges that "will

[be] process[ed]" by the IDHR, and those that "will [be] process[ed]" by the Commission. Those paragraphs are followed by this statement:

> In order to avoid delay on those charges reserved to EEOC ... IDHR hereby waives its exclusive right to process those charges for 60 days, as provided in Section 706(c) of Title VII ... so that EEOC can take *immediate action* on such charges. (emphasis added).

The language of the agreement indicates that the state's decision to waive its review prerogative took place during the drafting and execution of the agreement, and that the actions of the IDHR's agent in administering the agreement were no more than icing on an already baked cake. Once Marlowe's complaint was filed with the EEOC, the agreement worked "instantaneous 'constructive termination'" of the state's jurisdiction over her charges. *Griffin v. Air Prods. and Chemicals, Inc.,* 883 F.2d 940, 943 (11th Cir.1989). This is the conclusion of three other courts of appeals as well. *See Trevino–Barton v. Pittsburgh Natl. Bank,* 919 F.2d 874, 879 (3rd Cir.1990); *EEOC v. Techalloy Maryland, Inc.,* 894 F.2d 676, 678–79 (4th Cir.1990); *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1478–80 (9th Cir. 1989).

### III.

We conclude that Marlowe's complaint was timely filed with the EEOC on January 21, 1987, 299 days after her allegedly unlawful discharge. The decision of the district court granting summary judgment to the defendants is therefore reversed and this case remanded for further proceedings consistent with this opinion.

6. Defendants put great stock in the fact that the state processed Marlowe's complaint in contravention of our reading of the intent behind the agreement. They insist that the state's actions are highly probative of the agreement's actual meaning. It is certainly true that actions often speak louder than words, but not in this case. As between the expressed intentions of state and

federal policymakers—those "'charged with the responsibility of setting [the agreement's] machinery in motion, of making [its] parts work efficiently and smoothly while they are yet untried and new,'" *Udall v. Tallman,* 380 U.S. at 16, 85 S.Ct. at 801 (citation omitted)—and the actions of their subordinates, we put considerably greater stock in the former.