**UNITED STATES of America,**
**Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 2:96–CV–95–RL.**

United States District Court,
N.D. Indiana,
Hammond Division.

July 21, 1999.

Carol A. Davilo, United States Attorneys Office, Dyer, IN, Frances M. Zizila, U.S. Department of Justice, Environmental Enforcement Section, Environmental and Natural Resources Division, Washington, DC, for United States of America, plaintiff.

Robert M. Olian, Sidley and Austin, Chicago, IL, James Nolan, Office of the General Counsel, Amoco Oil Company, Chicago, IL, Angus Macbeth, Sidley and Austin, Washington, DC, for Amoco Oil Company, defendant.

### ORDER

LOZANO, District Judge.

This matter is before the Court on (1) The United States' Motion for Partial Summary Judgment on Liability on Its Eighth, Ninth, and Eleventh Causes of Action, filed on October 7, 1998; (2) Motion of Defendant, Amoco Oil Company, for Summary Judgment on Counts Eight, Nine, and Eleven of the Complaint, filed on October 8, 1998; and (3) Request for Oral Argument on Amoco's Motion for Summary Judgment, filed by Defendant, Amoco Oil Company, on November 23, 1998. For the reasons set forth below, the United States' summary judgment motion is **GRANTED IN PART and TAKEN UNDER ADVISEMENT IN PART;** Amoco Oil Company's summary judgment motion is **DENIED IN PART and TAKEN UNDER ADVISEMENT IN PART;** and the request for oral argument is **DENIED.**

### BACKGROUND

The United States of America, through the Environmental Protection Agency ("EPA"), has filed a suit claiming that Amoco Oil Company ("Amoco") has violated environmental laws. The parties have filed cross-motions for summary judgment on three of EPA's claims, which involve the Clean Air Act, 42 U.S.C. § 7401, *et seq.* and regulations promulgated thereunder.

Amoco operates a petroleum refinery in Whiting, Indiana. The summary judgment motions focus on sulphur recovery operations at the refinery, and Amoco's briefs, fact statement, and exhibits portray those operations as follows: The refinery has a "sulphur recovery unit" which recovers sulphur from process gases, and is referred to by Amoco as "No. 2 SRU" (even though apparently there is only one sulphur recovery unit at the refinery). No. 2 SRU (hereinafter "the SRU" for brevity) consists of two amine strippers; two sour water strippers; three Claus trains, called "A-train," "B-train," and "C-train"; a tail gas unit; a standby tail gas incinerator (hereinafter "the incinerator" for brevity); and an emergency flare.

The Claus trains are of particular importance to the summary judgment motions. According to Amoco's materials, each Claus train consists of a thermal reactor and three catalytic reactors. The Claus trains oxidize hydrogen sulfide to sulphur dioxide, which reacts with the hydrogen sulfide in the presence of a catalyst to form elemental sulphur and water. The elemental sulphur is collected and sold. All three Claus trains normally operate simultaneously, but two can operate while one is down for repairs. Regarding input, acid gas from the amine strippers is fed to all three Claus trains. Gas from the sour

water strippers is fed only to B-train and C-train. Regarding output, tail gas is fed from the Claus trains to the tail gas unit and the incinerator. The tail gas unit converts sulphur compounds in the gas exhausted from the Claus trains to elemental sulphur. Unlike the incinerator, the tail gas unit serves as a pollution control device and has a continuous emissions monitor.

As portrayed in Amoco's materials, the operations of the SRU have changed over time. A-train and B-train were constructed in 1971, with C-train constructed later during 1979–81. At about the same time C-train was built, Amoco added the tail gas unit. Before the additions of C-train and the tail gas unit, tail gas from A and B-trains was routed into the atmosphere through only one outlet, the incinerator. Since the additions, Amoco has used the tail gas unit as the primary outlet for all three Claus trains. However, when the tail gas unit is temporarily inoperable, Amoco routes tail gas from A and B-trains to the incinerator, thus bypassing the pollution control feature and continuous emissions monitor on the tail gas unit. Amoco also sends what it considers negligible amounts of tail gas from C-train through the incinerator for brief periods when the tail gas unit cannot be used because of equipment startup, shutdown, or malfunction. *See* Amoco Summ.J.Br., pp. 4–5; Amoco Stmt. of Undisputed Material Fact; Amoco Summ.J.Ex. 5; Amoco Summ.J.Ex. 13 at Bates 933 (describing Claus trains as one of the "four basic processing sections" that make up the SRU); Amoco Summ. J.Ex. 11 at Bates 228.

EPA asserts that Amoco's routing tail gas through the incinerator and other procedures it has followed or not followed since adding C-train have violated regulations that were promulgated after A and B-trains were constructed, but before C-train was constructed. Amoco denies this.

*DISCUSSION*

Summary judgment motions often turn on the strength of evidence, but interpreting regulatory language is actually more central to resolving the summary judgment motions before the Court now. Some ground rules apply:

[A court should] give deference to the views of the agency charged with administering [a] statute, so long as the agency's suggested interpretation is reasonable. Similarly, when the question at hand involves an administrative agency's interpretation of its own regulation, and the meaning of the regulation is in doubt, the courts will defer to the agency's interpretation if that interpretation is reasonable. In both circumstances, deference to an agency's interpretation is appropriate only because the intent of the drafter or drafters—whether Congress or the agency itself—is in doubt. Intent is, of course, at the heart of the judicial inquiry because the courts endeavor to give effect to the designs of Congress and the agencies to which the legislature has delegated authority. In discerning intent, courts traditionally focus on the language of statutes and regulations because we presume that legislatures and agencies mean what they say; most of the time, the "plain language" of a statute or regulation will be the best indicator of the enacting body's will, and thus, only when the text is silent or ambiguous will [a court] defer to an administrative agency's interpretation.

*Marlowe v. Bottarelli*, 938 F.2d 807, 811–12 (7th Cir.1991) (citations omitted).

The issues here arise out of Amoco's use of the incinerator since adding C-train. EPA concedes that before C-train and the tail gas unit were added in 1981, Amoco could legally route tail gas from A and B-trains to the atmosphere by way of the incinerator. However, EPA claims that under new regulations in effect by 1981, adding C-train meant that gas from all three trains had to pass into the atmosphere through a continuous emissions monitor, something the tail gas unit has but the incinerator lacks. According to EPA, the three trains form a single "Claus sulphur recovery plant" subject to the new regulations. Amoco concedes that C-train

falls under the regulations, but it argues that the individual trains are separate plants, so adding C-train did not put A and B-trains under the regulations. Thus, Amoco says, it may continue to freely direct tail gas from A and B-trains to the incinerator, bypassing the pollution control feature and continuous emissions monitor on the tail gas unit. Amoco also alleges that it may direct small amounts of tail gas from C-train through the incinerator when the tail gas unit cannot be used because of equipment start-up, shutdown, or malfunction.

With this background, we turn to the regulatory language. Part 60 of Title 40 of the Code of Federal Regulations contains "Standards of Performance For New Stationary Sources" under the Clean Air Act. It applies to "any stationary source which contains an affected facility, the . . . modification of which is commenced after publication . . . of any standard . . . applicable to that facility." 40 C.F.R. § 60.1(a). Subpart J of Part 60 prescribes specific standards for petroleum refineries and designates "Claus sulphur recovery plants" as "affected facilities" (with an exception for low-capacity plants that Amoco does not meet). 40 C.F.R. § 60.100(a). " 'Modification' means any physical change in, or change in the method of operation of, an existing facility which increases the amount of any air pollutant . . . emitted into the atmosphere by that facility. . . ." 40 C.F.R. § 60.2. " 'Existing facility' means . . . any apparatus of the type for which a standard is promulgated in [Part 60], and the construction or modification of which

was commenced before the date of proposal of that standard." 40 C.F.R. § 60.2.

So, a "change that increases the amount of any air pollutant . . . emitted into the atmosphere by" an existing "Claus sulphur recovery plant" constitutes a "modification" of an "affected facility" that subjects the plant to Part 60 and its Subpart J. EPA argues that this is exactly what happened when Amoco added C-train, thus requiring Amoco to route all tail gas from all three of its Claus trains to the tail gas unit. Amoco takes issue with this proposition in several ways.

First, Amoco argues that three separate Claus trains cannot form a single Claus sulphur recovery plant, but rather that its individual trains are individual plants. Thus, it maintains, adding C-train did not amount to modifying an existing facility, but rather amounted to adding a third and separate plant. So, the question becomes: What's a "Claus sulphur recovery plant"? A regulation defines one as "a process unit which recovers sulphur from hydrogen sulfide by vapor-phase catalytic reaction of sulphur dioxide and hydrogen sulfide." 40 C.F.R. § 60.101(i). There is no question that Amoco's Claus trains recover sulphur in the way this regulation describes, so we need to know what a "process unit" is.

Subpart J does not provide a definition of "process unit" so we can look to the dictionary. See Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (consulting a dictionary to determine that a "critical phrase . . . comfortably bears the meaning" assigned by an agency).[1] It says "unit" includes "a piece

---

[1] EPA points to a provision in Subpart J defining "refinery process unit," § 60.101(f), and says that definition covers "process unit." Yet "refinery" is not necessarily superfluous, as both the precise terms "refinery process unit" and "process unit" appear in close proximity in the same section of Subpart J. See 40 C.F.R. § 60.101(f), (i) & (m). Indeed, the presence or absence of "refinery" takes on possible significance when one considers that a "refinery process unit" means a "segment of a petroleum refinery," 40 C.F.R. § 60.101(f), while a "Claus sulphur recovery plant," defined in part as a "process unit,"

§ 60.101(i), "need not be physically located within the boundaries of the petroleum refinery to be an affected facility," § 60.100(a).

In any event, the definition states that " 'refinery process unit' means any segment of the petroleum refinery in which a specific processing operation is conducted." 40 C.F.R. § 60.101(f). The specific processing operation of sulphur recovery is conducted in the SRU and all three of Amoco's Claus trains. The regulations do not define "segment" but the dictionary says it means "a piece or fragment of something . . . PORTION . . . one of the constituent parts into which a body, enti-

or complex of apparatus serving to perform one particular function." Webster's Third New International Dictionary (Unabridged) 2500 (1971). The term "process" includes a "particular method or system of doing something, producing something, or accomplishing a specific result; *esp:* a particular method or system used in a manufacturing ... or other technical operation." *Id.* at 1808. Amoco's own summary judgment materials show that its three Claus trains (1) are all part of the same sulphur recovery unit, and together form one of four basis process sections in the SRU, (2) are all used simultaneously to recover sulphur, (3) share common gas sources (although A-train receives no gas from the sour water strippers); and (4) all emit gas into the atmosphere through two common outlets, the tail gas unit and the incinerator. *See* Amoco Summ.J.Br., pp. 4–5; Amoco Stmt. of Undisputed Material Fact; Amoco Summ.J.Ex. 5; Amoco Summ.J.Ex. 13 at Bates 933 (describing Claus trains as one of the "four basic processing sections" that make up the SRU); Amoco Summ. J.Ex. 11 at Bates 228. These common features qualify the trains as a "complex of apparatus serving to perform one particular function," *i.e.*, the "process" of recovering sulphur, which is used in the "technical operation" of refining petroleum.

Amoco points out that "process unit" is defined in other subparts of Part 60 besides Subpart J. 40 C.F.R. §§ 60.561, 60.591, 60.631. Those subparts do not deal with Claus sulphur recovery plants. *See id.* Definitions they set out govern those subparts only. *Id.* Moreover, Amoco quotes the definitions out of context and without conscientiously explaining how they support its position. Amoco Reply Br., pp. 7–8. The definitions of "process unit" contained in the other subparts do not change the analysis here.

Working from another angle, Amoco asserts that the definition of "Claus sulphur recovery plant" is not what controls at all.

It maintains that "affected facility" has its own definition in Subpart A, which trumps Subpart J's designation of Claus sulphur recovery plants as affected facilities. True, Subpart A contains general language that purports to inform all other subparts of Part 60, including Subpart J, the one that directly deals with petroleum refineries and contains the definition of "Clause sulphur recovery plant." *See* 40 C.F.R. § 60.1(a). Amoco stresses that under Subpart A, an "affected facility" is "any apparatus to which a standard is applicable," § 60.2, and urges that "apparatus" denotes singular items, not multiple items devoted to a similar purpose like its three Claus trains. (The definition of "existing facility" similarly employs the term "apparatus." 40 C.F.R. § 60.2.) Amoco says that Subpart J's purporting to designate Claus sulphur recovery plants as affected facilities conflicts with and must be subordinated to "apparatus" as used in Subpart A.

The two provisions, however, do not conflict. Again, Subpart A says that an "affected facility" is generally "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2. The more specific Subpart J deems Claus sulphur recovery plants affected facilities. Its first section is captioned in part, "Applicability, *designation of affected facility*," and it prescribes—makes "applicable"—standards for "the following affected facilities ... Claus sulphur recovery plants." 40 C.F.R. § 60.100(a) (emphasis added); *see also* E.P.A. Reply Ex. 1 (listing "Sulphur Recovery Plants" and "Petroleum Refineries" as new "Affected facilities"); *Potomac Elec. Power Co. v. EPA,* 650 F.2d 509, 515–16 (4th Cir.1981) (applying a similar analysis to other Part 60 regulations). So, Subpart J identifies a specific example of what Subpart A generally defines. Subpart J then goes on to define "Claus sulphur recovery plant," specifying that the

---

ty, or quantity is or may be divided." Webster's Third New International Dictionary (Unabridged) 2056 (1971). By Amoco's own description, one of the constituent parts of

Amoco's refinery is the SRU, which includes the three Claus trains, which form one of four basic process sections in the SRU. Amoco Summ.J.Ex. 13, at Bates 933.

definition controls for that subpart. 40 C.F.R. §§ 60.100(a) & 60.101(i).

Even assuming that "apparatus" somehow controls does not mean Amoco wins. The term is not defined in the regulations, so back to the dictionary, according to which "apparatus" is not limited to singular items as Amoco contends, but includes "a collection or set of materials, instruments, appliances, or machinery designed for particular use." Webster's Third New International Dictionary (Unabridged) 102 (1971). Three Claus trains devoted to sulphur recovery form a collection or set of machinery or instruments designed for a particular use. Indeed, elsewhere Subpart 60 recognizes multiple identical items as an affected facility, and does not thereby contort the meaning of "apparatus." 40 C.F.R. § 60.500(a) (designating the "total of all loading racks at a bulk gasoline terminal" an "affected facility").

The above interpretation of the regulations is based on their plain language, which the Court finds unambiguous. The parties debate vigorously whether EPA has issued its own full-fledged interpretation of the regulation, an interpretation of the type that deserves deference if reasonable. Yet the Court need not rely on EPA's gloss to reach the result herein. "Only when the [regulatory] text is silent or ambiguous will [a court] defer to an administrative agency's interpretation" of a regulation. *Marlowe*, 938 F.2d at 812. The regulatory language here speaks clearly, and this ruling as been reached without granting EPA any deference.

The issues regarding the role and meaning of "Claus sulphur recovery plant" covered above are no doubt essential to the summary judgment motions. In addition to those issues, the parties present a myriad of others. Some of the arguments appear to be alternative ones that fall away in light of the ground covered already in this ruling, some appear to have marginal if any importance to EPA's claims, and some may be premature because they touch on damages while the present motions nominally deal with liability only.

The parties' briefs suggest that their dispute over the role and meaning of "Claus sulphur recovery plant" has created something of a log jam in otherwise productive negotiations, and the Court has now resolved the dispute. In light of these circumstances, the Court will take the remainder of the issues presented in the summary judgment motions under advisement. Within sixty days, the parties should inform the Court in writing whether they would like a ruling on the remaining issues. If the parties can agree to pursue some issues and withdraw others, they are free to do so.

Amoco has requested oral argument on the summary judgment motions. Amoco's stated reasons for needing oral argument are rather terse and not compelling. The Court does not believe that oral argument would be helpful to resolve the issues addressed in this order. Either party may request oral argument on any remaining issues to be resolved on summary judgment, and the Court will consider the request.

*CONCLUSION*

For the foregoing reasons the United States' summary judgment motion is **GRANTED IN PART and TAKEN UNDER ADVISEMENT IN PART;** Amoco Oil Company's summary judgment motion is **DENIED IN PART and TAKEN UNDER ADVISEMENT IN PART;** and the request for oral argument is **DENIED.**