In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1268

BOOKER T. JOHNSON,

Plaintiff-Appellee,

v.

J.B. HUNT TRANSPORT, INCORPORATED,
c/o Target Distribution,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 183--Charles N. Clevert, Judge.

ARGUED DECEMBER 7, 2000--DECIDED February 13, 2002


  Before BAUER, MANION, and ROVNER, Circuit
Judges.

  ROVNER, Circuit Judge.  Booker T. Johnson
was employed by J.B. Hunt Transport, Inc.
("Hunt"), an interstate motor carrier,
until he was terminated from his position
on June 12, 1995. He worked as a road
driver operating a tractor-trailer on a
regular route, and later became a driver
trainer. He transferred to the Hunt
facility in Bridgeview, Illinois, in
1990, and received numerous safety awards
and commendations for good performance at
that facility. He achieved the status of
"gold driver" which entitled him to
certain advantages such as getting a new
truck whenever one was available,
choosing his routes, and never having to
wait for a load, as well as fuel and
performance bonuses. In late 1994,
Johnson learned of a job opening at the
terminal in Oconomowoc, Wisconsin, which
would allow him more time at home. He
contacted Sharon Lincks, who was the
Project Manager at that facility, and was
granted an interview in December 1994. At
that time, the Oconomowoc facility
employed only one African-American
driver. Johnson is African-American, as
were approximately 80% of the drivers at
the Bridgeview terminal. Lincks informed
Johnson that the interview went well and
that it would take approximately 5 days

to process his paperwork. When he received no further word from her, he called the Oconomowoc facility, and was informed by a dispatcher that several new drivers had been hired but that he was placed on a wait list. He then contacted the operations manager in Chicago concerning his interest in the transfer, and that manager arranged for the transfer which took place in February 1995.

The testimony at trial indicated actions by Hunt singling Johnson out for unfavorable treatment. Although he was the first person to arrive at the dispatch office, the other drivers were given their assignments first, and he was the last one on the list to get his paperwork. Moreover, he was given the most time-consuming assignments on the slowest routes, which affected his income because drivers were paid by the load rather than the mile. When Johnson walked in the room, Lincks would act ". . . like she smelled something or go to coughing or hide her face or cover her nose or something like that." She also repeatedly suggested to Johnson that he should go back to Chicago to drive. Finally, Lincks told him that there were no assigned trucks at the Oconomowoc terminal, which meant that he was not able to exercise his right as a gold driver to the new trucks. Johnson testified, however, that he observed the same trucks going to Iowa every day with the same drivers. He nevertheless was generally assigned older trucks that had to be cleaned before being used. Prior to the Memorial Day weekend, the Fleet Manager proposed that Johnson work on Saturday in exchange for taking off Memorial Day, which Johnson decided to do. When Johnson was absent on Memorial Day, both Lincks and Marcus Bishop, a dispatcher, contacted him. When he explained that he had traded his holiday, Lincks told him that if he did not work that day, he would be drug tested and could not drive out of the Oconomowoc facility anymore.

Johnson called the main office in Arkansas after that conversation to complain that Lincks was prejudiced and was discriminating against him in the assignment of trucks, routes and loads, and that Lincks had told him he could not work out of the Oconomowoc facility anymore. A meeting was held to discuss

his concerns, and Johnson returned to work on June 12. On that day he was informed by Lincks that he had been chosen for a random drug test and was ordered to report to the Wilkinson Clinic to give a urine specimen. Johnson testified that he went to the clinic and waited approximately 15 minutes because no nurses were available. He was then told to go to lunch, and did so. While at lunch, he phoned Lincks to inform her of what happened at the clinic. He then returned to the clinic, and after an additional 15-20 minute wait, provided the urine sample. The specimen was taken by Cynthia Raether, who testified that the temperature of the specimen was normal, and who indicated on some of the forms that the "specimen appears dilute/pale in color." Later that day, Lincks told Johnson that he had to return to the clinic that day to be tested again because the sample was diluted. She further told him she was going to accompany him to the clinic to do an observed sample. Johnson believed this was further discriminatory harassment, and refused to do so. He was then fired.

In response to Johnson's claim of discrimination, Hunt asserted that it was simply following Department of Transportation ("DOT") regulations applicable to Federal Drug Screening, and that the clinic had determined that the sample was diluted and that a retest was required. Raether and her supervisor at Wilkinson Clinic testified at the trial. Raether testified that Johnson did not exhibit any behavior indicating an attempt to tamper with the specimen and that the temperature of the specimen was normal. She further stated that she made no recommendation that further testing of the sample was needed or that a second sample was needed that day. She also testified that the clinic never performed any preliminary testing on samples, never made any determination as to the adequacy of the specimen, and never made any recommendations to any employer as to the need for additional drug testing. Her supervisor, Beverly Yunto, testified that she made no such call to Hunt either, that the DOT rules required a direct observation collection only when the collection site person observed behavior clearly evidencing an attempt to tamper with a specimen or where the temperature was outside the normal range, and that

neither of those circumstances were present in Johnson's case. She further stated that the Wilkinson Clinic does not do observed collections.

The jury found in Johnson's favor on his claims under Title VII and sec. 1981, and judgment was entered against Hunt in the amount of $202,633.62 plus costs and attorney's fees. Hunt appeals, arguing that the Title VII claim was not timely filed and that the district court erred in precluding the testimony of Lincks and Clay Perry, Lincks' supervisor, as a sanction for noncompliance with discovery obligations. Because we affirm the district court on those issues, we need not consider Hunt's additional contention on appeal that Johnson had an insufficient contractual relationship with Hunt to support a sec. 1981 claim.

I.

We turn first to Hunt's claim that the Title VII charge was not timely filed with the EEOC. Pursuant to Title VII, Johnson was required to file his claim with the EEOC within 300 days after the alleged employment practice occurred. 42 U.S.C. sec. 2000e-5(e)(1). For a state such as Wisconsin having its own antidiscrimination agency, however, Title VII also provides that no charge may be filed with the EEOC "before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated . . . ." 42 U.S.C. sec. 2000e-5(c). In EEOC v. Commercial Office Products Co., 486 U.S. 107, 114-15 (1988), the Supreme Court held that a state proceeding need not be finally ended in order for it to be considered "terminated" under this provision. Instead, the Court accepted the EEOC's contention that "a state agency 'terminates' its proceedings when it declares that it will not proceed, if it does so at all, for a specified interval of time." Id. at 115.

Johnson filed his charge with the Wisconsin Equal Rights Division ("ERD") on April 4, 1996. The 300-day period expired on April 7, 1996, and Hunt claims that the State proceedings were not terminated before that date and therefore the charge was untimely. This issue therefore ultimately hinges on whether

the state proceedings were "terminated" by April 7, 1996. To answer that question, we must examine the worksharing agreement entered into between the EEOC and the ERD.

The agreement provides, in relevant part:

In order to facilitate the assertion of employment rights, the EEOC and the [ERD] each designate the other as its agent for the purpose of receiving and drafting charges.

. . .

Normally, once an Agency begins an investigation, it will resolve the charge. Charges may be transferred between the EEOC and [the ERD] within the framework of a mutually agreeable system. Each Agency will advise Charging Parties that charges will be resolved by the Agency taking the charge except when the Agency taking the charge lacks jurisdiction or when the charge is to be transferred . . . .

. . .
For charges originally received by the EEOC and/or to be initially processed by the EEOC, the [ERD] waives its rights to exclusive jurisdiction to initially process such charges for a period of 60 days, for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

In addition, the EEOC will initially process the following charges:

- All Title VII charges received by the [ERD] 240 days or more after the date of violation.

Hunt acknowledges that pursuant to this agreement, the ERD acted as an agent of the EEOC in accepting Johnson's charge as jointly filed on April 3, 1996, and that his charge was thereby properly filed with the EEOC on that date. Hunt further admits that the ERD, through the worksharing agreement, could properly waive its 60-day exclusivity period set forth in 42 U.S.C. sec. 2000e-5(c). That is precisely what the worksharing agreement accomplished in this case. The language of the agreement is not

discretionary. It waives ERD's right to exclusive jurisdiction for all charges which are to be initially processed by the EEOC, and further provides that the EEOC will initially process all charges filed more than 240 days after the date of violation. Hunt does not assert that the state had a contrary intent in executing the worksharing agreement, and in fact concedes that the language would normally effect a waiver. We therefore hold, consistent with its plain language, that the worksharing agreement is self-executing, and therefore the waiver of exclusive jurisdiction occurred at the time that the complaint was filed with the ERD. See Marlowe v. Bottarelli, 938 F.2d 807 (7th Cir. 1991) (holding that waiver provision of Illinois' worksharing agreement was self-executing, and worked instantaneous constructive termination of the state's jurisdiction over the charge); Ford v. Bernard Fineson Development Center, 81 F.3d 304, 308-311 (2d Cir. 1996) (holding that New York's worksharing agreement contained a self-executing waiver of the state's right to exclusively handle discrimination claims for 60 days, and that the waiver constituted a termination under sec. 2000e-5(c)). Under Commercial Office Products, that constitutes a termination of the state proceeding for purposes of the statute. That interpretation is consistent with the federal regulations interpreting the statute, which provide that a charge initially presented to the state agency will be deemed filed with the EEOC: (1) upon expiration of 60 days after the charge is sent to the state agency; or (2) upon termination of the state proceeding; or (3) upon waiver by the state agency of its right to exclusively process the charge, whichever is earliest. 29 C.F.R. sec. 1601.13(b)(1). Here, the worksharing agreement waived the ERD's exclusive right to process the charge when the charge was filed with the ERD, and accordingly the charge was timely filed with the EEOC.

   In response to that authority, Hunt asserts that the post-filing actions of ERD negated the waiver. Upon receiving the charge, ERD sent a preprinted form to the EEOC, and checked a box indicating: "Pursuant to the worksharing agreement, this charge is to be initially investigated by the [ERD]." Hunt argues that the form evidenced an intent by ERD

to process the charge despite the language of the worksharing agreement. There are a number of problems with this argument. First, the sentence upon which Hunt relies explicitly recognizes the validity of the worksharing agreement, and purports to act consistent with that agreement. Hunt, however, would have us interpret that language as evidencing an intent to contravene the worksharing agreement. That belies the plain language itself. It is clear that the person who transmitted the form erroneously believed that under the worksharing agreement, ERD was responsible for initially processing the claim. That error does not impact the determination of timeliness. As we explained earlier, the provisions of the worksharing agreement at issue are self-executing, and the waiver occurred at the moment that the charge was filed with the ERD. The subsequent actions here do not alter that constructive termination. Accord Marlowe, 938 F.2d at 809, 814 (although the state agency processed her charge for two months after it was filed, waiver in workshare agreement was self-executing resulting in instantaneous constructive termination at time of filing); Ford, 81 F.3d at 308-11 (waiver in worksharing agreement was effective as soon as charge was filed and instantaneously terminated the proceedings under sec. 2000e-5(c), despite state agency's actions in immediately conducting a four-month investigation of the charge). See also Brown v. Crowe, 963 F.2d 895, 899-900 (6th Cir. 1992) (where state agency made similar error in determining it should initially process a charge, the court declined to decide whether the worksharing agreement was self-executing, but held sua sponte that the doctrine of equitable tolling applied).

II.

The remaining issue is whether the court erred in barring the testimony of two of Hunt's witnesses, based upon Hunt's conduct during discovery. We review a district court's discovery sanctions only for abuse of discretion. That standard "'means something more than our belief that we would have acted differently if placed in the circumstances confronting the district judge.'" Williams v. Chicago Bd. of Educ., 155 F.3d 853, 857 (7th Cir. 1998), quoting Anderson v. United Parcel

Service, 915 F.2d 313, 315 (7th Cir. 1990). For an abuse of discretion to occur, the district court's decision must strike us as fundamentally wrong. Id.

After Hunt repeatedly failed to produce Lincks and Perry for depositions, the district court barred Hunt from using them at trial. Johnson first noticed the depositions of Lincks and Perry for January 28, 1999, which was continued by mutual agreement. The depositions were noticed a second time for March 25 and 26, 1999. In a letter dated March 24, Hunt acknowledged those dates but indicated reluctance to engage in depositions if it would not impact summary judgment on unrelated legal issues such as the timeliness of the charge and the existence of a contractual relationship for purposes of the sec. 1981 claim. Hunt further stated in that letter that written discovery was outstanding and that it assumed Johnson would want the responses prior to taking depositions. Hunt did not produce those witnesses for deposition on March 25 or 26, and did not provide those written responses to discovery until May 24, 1999, well after the close of discovery on May 3. In the meantime, Johnson continued to discuss the depositions with Hunt, and on April 13 again referenced the notices of deposition. With the close of discovery approaching on May 3, Johnson filed a motion to compel compliance with discovery on April 30. The court denied that motion without prejudice, stating that the motion did not set forth an effort to consult with Hunt to resolve the discovery disputes. As was stated, Johnson eventually received the written discovery responses on May 24. On June 23, Johnson wrote to Hunt again requesting that Hunt produce the witnesses for deposition. Johnson sent another letter on July 23, indicating that the attorney for Hunt, Thomas Carney, had failed to return any of his previous telephone calls (a problem noted in earlier documents as well), and again requesting to depose Lincks and Perry.

Hunt responded with a letter in which it refused to produce anyone for deposition without a court order. In the letter, Carney acknowledged that shortly before the discovery deadline of May 3, he indicated he would have no problem with

extending discovery, but he asserted that Johnson failed to seek such an extension with the court. Accordingly, Hunt adopted the position that discovery was closed. The letter further stated that:

because of the wide disparity in our positions, I frankly do not see that there is anything to discuss. You are, of course, entitled to petition the Court to be allowed to conduct whatever discovery you want to. If you elect that course, I will explain my position, and the Judge will decide. If the Judge decides that close of discovery meant close of discovery, we will go to trial. If the Judge decides something else, we will abide by his decision.

Johnson filed a renewed motion to compel and later a motion in limine to exclude the testimony of Lincks and Perry. The court granted the latter motion and barred Hunt from presenting the testimony of Lincks and Perry at trial. In so holding, the court stated, in pertinent part:

. . . this seems like it's a problem in understanding a very simple term. And it's called incivility. Mr. Carney, it appears to me that you are desirous of having things go both ways. Here a request was made to conduct discovery of two key defense witnesses prior to the expiration of the deadline for discovery. If the request, the timely request had been honored by you discovery would have taken place. When further requests were made as evidenced by your time line you did not immediately respond with new dates that you would be available. And ultimately when further requests were made you said, oh, the time for discovery has passed.

  The defense will be barred from presenting the two witnesses who were not tendered for depositions. And I will underscore the remark I just made earlier. I am barring it because you failed to produce the witnesses when you were requested to do so and you declined to submit them to discovery in what I believe to be a most unprofessional, unprofessional and I think abusive manner during the course of this discovery. . . .

  The sequence of events reveals a pattern

of dilatory conduct by Hunt. Hunt failed to respond to written discovery in a timely manner and relied on the absence of those responses as a basis to delay the depositions of Lincks and Perry. Hunt ultimately did not respond to the written discovery requests until after the discovery deadline had passed, indicating that it would have no problem extending discovery given the delay. It then refused to produce Lincks and Perry for deposition because the discovery deadline had passed. That is precisely the type of conduct for which discovery sanctions are appropriate. Litigants are expected to act in good faith in complying with their discovery obligations, and Hunt's reliance on its own delay to justify refusing to produce Lincks and Perry was anything but good faith. Hunt ultimately refused to even discuss resolving the outstanding discovery issues with opposing counsel, choosing instead to let the court decide it. The court did so, and Hunt now seeks refuge from that decision. It will find no comfort here. The record amply supports the court's decision that sanctions were appropriate, and those sanctions were tailored to the nature of the violation. Although Hunt claims that the sanction decimated its case and amounted to a directed verdict, that is inconsistent with its position earlier in the litigation that Lincks had no relevant information, and with its initial position that the second test was ordered by the clinic and it was merely complying with that order. The district court did not abuse its discretion in imposing the discovery sanction. It was precisely tailored to the nature of the discovery violation. See Newman v. Metropolitan Pier & Exposition Authority, 962 F.2d 589, 591 (7th Cir. 1992) (upholding dismissal of suit where plaintiff repeatedly failed to appear for deposition and failed to comply with written discovery deadline); Melendez v. Illinois Bell Telephone Co., 79 F.3d 661, 672 (7th Cir. 1996) (district judge may "impose sanctions that are 'just,' that is, proportionate to the circumstances surrounding a party's failure to comply with discovery rules"). Because there is no other challenge to the Title VII determination, and that claim fully supports the relief ordered here, we need not consider the sec. 1981 issue. The decision of the district court is AFFIRMED.